## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**MARY J. KANDEL,**

   **Plaintiff,**

**v.**            **Civil Action No.: 1:09-CV-31**
                **JUDGE KEELEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

## I.  INTRODUCTION

On February 12, 2009, Plaintiff Mary J. Kandel ("Plaintiff"), by counsel Montie VanNostrand, Esq., of VanNostrand & Morton, PLLC, filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant") pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). On April 13, 2009, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and administrative transcript of the proceedings. On May 9, 2009 and July 8, 2009, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [12] [15]. Following review of the motions by the parties and the transcript of administrative proceedings, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A. Procedural Background

On October 15, 2001, Plaintiff applied for supplemental security income, alleging disability as of June 30, 2001 due to severe chronic asthma, arthritis "left hip gone - bone to bone," severe pain with no relief of pain from medications. Tr. at 68-71 & 78. On July 24, 2003, the United States Administrative Law Judge ("ALJ") held a hearing, and Plaintiff testified under oath. Tr. at 369-410. *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge). In August 2003, the ALJ denied Plaintiff's 2001 application for disability ("2003 ALJ decision"). Tr. at 16-31. The Appeals Council also denied Plaintiff's request for review. Tr. at 8-10. *See* 20 C.F.R. § 404.967 (Appeals Council review--general). In September 2004, Plaintiff filed a complaint in this Court to appeal the 2003 ALJ decision denying disability. Tr. at 595-98.

While the appeal was pending before this Court, Plaintiff again applied for supplemental security income on April 13, 2005, alleging disability alleging disability as of April 13, 2005, due to asthma, bronchitis, back / hip arthritis, ovarian cysts, chronic obstructive pulmonary disease "COPD," fibromyalgia, bursitis, carpal tunnel of both arms, osteoarthritis, degenerative arthritis, low blood sugar with diabetic tendencies, pleurisy of the lungs, clinic depression, and mobility problems. Tr. at 670-73, 681-85. On January 6, 2006, the Honorable James E. Seibert, United States Magistrate Judge, recommended to remand the 2003 application to the ALJ for further proceedings. Tr. at 600-37. On March 22, 2006, the Honorable Robert E. Maxwell, United States District Judge, entered an order adopting the recommendation and remanding the case for further proceedings. Tr. at 638-40. In April 2006, the Appeals Council consolidated the 2003 application with the 2005 application and remanded both applications to the ALJ for further proceedings consistent with the

order from this Court.  Tr. at 644-45.

On February 22, 2007, a different ALJ held a second ALJ hearing in this case.  Tr. at 1060-1111.  On July 2, 2007, the ALJ issued an unfavorable decision to the Plaintiff, finding her not entitled to supplemental security income ("2007 ALJ decision").  Tr. at 572-90.  Plaintiff now requests judicial review of the ALJ decision denying her applications for disability.

**B.      Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case**

> Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g).  "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962).  Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979).  **"This Court does not find facts or try the case *de novo* when reviewing disability determinations."**  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972).  "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). In applying these legal standards, the Court reviews the decision by the ALJ.

### C. Standard for Disability and Five-Step Evaluation Process

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment prior to Step Four):

Step One:    Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:    Determine whether the plaintiff has a severe impairment;

Step Three:    Determine whether the plaintiff has a "listed" impairment;

*   Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:    Compare residual functional capacity assessment to determine whether the plaintiff can perform past relevant work;

Step Five:    Consider residual functional capacity assessment, age, education, and work experience to determine if the plaintiff can perform any other work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general). In following the five-step process

and coming to a decision, the ALJ makes findings of fact and conclusions of law. This Court will review the decision by the ALJ to determine whether it is supported by substantial evidence, in accordance with 42 U.S.C. § 405(g) and *Hays*.

## D.    Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence

### 1.    Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...

If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled ***regardless of your medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a)(1) (evaluation guide for employees who are not self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added). The ALJ found that Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision. Tr. at 577. The parties do not dispute ALJ's findings in Step One.

## 2. Step Two: Determine whether the Plaintiff has a Severe Impairment

> At the second step, we consider the medical severity of your impairment(s)...[A] severe impairment... [is] any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...We will not consider your age, education, and work experience...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs. Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989). In the 2003 ALJ decision, the ALJ found Plaintiff to have the following severe impairments: fibromyalgia, osteoarthritis of the hips, bronchial asthma, chronic obstructive pulmonary disease, adjustment disorder with depressed mood, and chronic pain syndrome. Tr. at 30.

In the 2007 ALJ decision now before this Court, the ALJ found Plaintiff to have the following severe impairments: "mild" degenerative arthritis / disc disease of the lumbar spine; degenerative arthritis / joint disease, bilateral hips; equivocal "mild" inflammatory arthritis / "fibromyalgia," by report; history of asthma / bronchitis; adjustment disorder with depressed mood; and history of polysubstance abuse (including alcohol, crack cocaine, and marijuana). Tr. at 577-78.

The ALJ made the new severe impairments finding following an evaluation of Plaintiff's credibility, based on a review of the evidence in the record. Tr. at 578-88.

a.     **The ALJ's Evaluation of Plaintiff Credibility Based on a Review of the Evidence in the Record**

(1)     **Standard for Evaluating Credibility**

SSR 96-7P provides the standard for the ALJ to assess credibility of disability plaintiffs.

> The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:
>
> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms...
>
> Second, once an underlying physical or mental impairment(s) could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4)...
>
> When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence,

including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements: 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*See* SSR 96-7p (emphasis added). The ALJ used the two-step process and factors in SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929 in evaluating Plaintiff's credibility. Tr. at 580-81. The ALJ found that Plaintiff has medically determinable impairments that could reasonably be expected to cause some of the symptoms described. Tr. at 581. However, the ALJ did not find Plaintiff credible based on a review of the evidence in the record. Tr. at 581.

### (2)     Review of Record from 1997 through 2000

In evaluating Plaintiff's credibility, the ALJ considered the history of Plaintiff's symptoms. Tr. at 581. In 1997, Plaintiff worked at the welfare office through the West Virginia Works program, in order to "work off [her] welfare check." Tr. at 78, 807, & 1071. In April and December 1997, Plaintiff obtained a doctor's note to exempt herself from the work program due to "an acute flare up of illness" and "chronic lung disease." Tr. at 212-13. Despite her lung problems, Plaintiff testified that she has smoked for 30 years but is trying to quit. Tr. at 806 & 1108. Plaintiff also stated that she could no longer work at the welfare office due to "painful arthritis" and "chronic pain." Tr. at 78 & 1071-72. In April 1998, Plaintiff first applied for supplemental security income, alleging disability since June 30, 1996. Tr. at 95 & 574. On October 28, 1998, a Disability

Determinations Service Examiner denied Plaintiff's claim, and she did not appeal. Tr. at 95 & 574.

**(3)      Review of Record from 2001 through 2004**

In April 2001, Plaintiff had an evaluation with Richard E. Topping, M.D., regarding her complaint of bilateral hip pain. Tr. at 140-42. Plaintiff reported that she had a L3/4 lumbar spine fracture at age 17. Tr. at 140. Plaintiff was able to perform a toe rise and heel stand without difficulty. Tr. at 140. Plaintiff was negative for radicular complaint on a bilateral straight leg raise test, but she did have increased left hip pain. Tr. at 140.

On October 15, 2001, Plaintiff applied for supplemental security income, alleging disability as of June 30, 2001 due to severe chronic asthma, arthritis "left hip gone - bone to bone," severe pain with no relief of pain from medications. Tr. at 68-71 & 78. The ALJ noted that Plaintiff failed to specifically allege back pain in her 2001 disability application, despite her allegations of breaking her back as a child. Tr. at 579.

In April 2002, Plaintiff had an evaluation with Arturo Sabio, M.D., regarding complaints of arthritis pains, shortness of breath, and restricted ambulation to 20 minutes on level ground. Tr. at 155. Plaintiff reported smoking three packs of cigarettes per week. Tr. at 155. Dr. Sabio noted that Plaintiff was able to walk with a normal gait and did not require ambulatory aids. Tr. at 159. Dr. Sabio found no muscle atrophy or weakness. Tr. at 159. Plaintiff reported that she did not have any injury to her back. Tr. at 156.

On May 20, 2002, a Disability Examiner initially denied Plaintiff's 2001 disability application. Tr. at 45. In July 2002, Plaintiff, by counsel, filed a request for reconsideration of this decision. Tr. at 54. On her request for reconsideration, Plaintiff stated that she is disabled due to musculoskeletal impairments consisting of degenerative hips, hands, lungs; a mental [impairment];

rheumatoid and osteoarthritis; mobility issues; chronic pain; depression; asthma; and "difficulty in sustaining activity." Plaintiff also said that "[e]xertional and nonexertional impairments prevent me from any work activity on a sustained basis." Tr. at 54. The ALJ noted that Plaintiff's impairment related complaints escalated dramatically after obtaining legal representation. Tr. at 579 & 581.

In August 2002, Plaintiff had a mental status exam with Sharon Joseph, Ph.D. Tr. at 237-39. Plaintiff stated that her daily activities consist of making the bed, washing dishes, cooking meals, going grocery shopping, and playing Nintendo video games. Tr. at 238. Plaintiff said she occasionally drives a car. Tr. at 238. Plaintiff admitted that she does drink alcohol occasionally despite being treated for alcohol dependence when she was 18 years old. Tr. at 238. She also stated that she was arrested for contributing to the delinquency of minors after having a party with teenagers present who had brought their own beer. Tr. at 238. She said she did not know they were minors, but the parents were concerned and brought criminal charges. Tr. at 238. Plaintiff acknowledged that in her 20's she used illegal drugs, primarily marijuana, but she said that she had not used illegal drugs since that time. Tr. at 238. Plaintiff reported that her medical history included a hernia operation at age 7, chronic bronchitis from birth, and frequent pneumonia as a child until approximately age 11 or 12. Tr. at 237. The ALJ noted that Plaintiff did not mention a back fracture in her medical history. Tr. at 579.

In September 2002, x-rays of Plaintiff's bilateral hips revealed no bone lesions, fracture, or dislocation. Tr. at 274. The imaging did demonstrate joint space narrowing, subchondral sclerois, geode formation, and central migration of both femoral heads, which may represent rheumatoid arthritis. Tr. at 274.

In November 2002, Wassim Saikali, M.D., of the Rheumatology and Pulmonary Clinic,

diagnosed Plaintiff with "fibromyalgia, active and severe." Tr. at 264. However, the ALJ noted that Dr. Saikali did not provide a basis for his diagnosis or report that he examined Plaintiff for the usual 11 out of 18 positive findings, which is the general indicator for fibromyalgia. Tr. at 263-66 (Saikali report); Tr. at 578 (ALJ decision). Dr. Saikali also opined that Plaintiff has "possible inflammatory arthritis." Tr. at 264. Dr. Saikali further found that Plaintiff "has some tenderness...[but] no obvious synovitis." Tr. at 264. Dr. Saikali prescribed the narcotic drug Darvocet to Plaintiff for pain. Tr. at 264.

In December 2002, Dr. Saikali reviewed Plaintiff's x-rays and noted "narrowing and osteoarthritis of both hips...[c]ould be suggestive of early inflammatory arthritis." Tr. at 266.

In March 2003, Dr. Saikali acknowledged that Plaintiff's "[d]egree of pain is more than the objective findings." Tr. at 305. In addition, blood tests for rheumatoid factor and ANA were negative. Tr. at 305. Dr. Saikali decided to continue prescribing the narcotic addictive opiate drug Lortab to Plaintiff, notwithstanding that this drug is usually contraindicated for long-term treatment of fibromyalgia. Tr. at 305 (Saikali report); Tr. at 578 (ALJ decision). Dr. Saikali noted that Plaintiff is seeking disability. Tr. at 306.

In May 2003, Plaintiff's counsel referred her to Cardinal Psychological Services for a psychological evaluation. Tr. at 309. The psychologists IQ tested Plaintiff and reported a verbal IQ of 90; a performance IQ of 98; and a full scale IQ of 93. Tr. at 311. Plaintiff said she last worked as a clerk at a Dairy Mart in Ohio for a year and a half. Tr. at 310. She said that she has also been a bartender "everywhere" for twenty years. Tr. at 310. The ALJ noted that income tax records do not show Plaintiff's bartending employment, which indicates that this work must have been performed "under the table." Tr. at 581. Plaintiff reported being charged with possession of

marijuana in 2001 and receiving six months probation. Tr. at 310. The ALJ noted that Plaintiff would have been in her "40's" in 2001, which contradicts her earlier statement that she had not used illegal drugs since her "20's." Tr. at 583-84. The ALJ also noted that Plaintiff failed to report to the psychologists regarding her prior arrest for contributing to the delinquency of minors. Tr. at 584.

In July 2003, Dr. Saikali completed a "fibromyalgia questionnaire" by the request of Plaintiff's counsel. Tr. at 335-44. Dr. Saikali noted that Plaintiff did not need a cane or other assistive device. Tr. at 339. Dr. Saikali opined that Plaintiff could lift twenty pounds frequently and can frequently bend and twist at the waist. Tr. at 340. Dr. Saikali found that Plaintiff does not have severe arthritis in one particular joint, but she has multiple joint complaints and muscle pain that is severe in nature. Tr. at 344. Dr. Saikali admitted that the "x-rays do not correlate with the symptoms all the time." Tr. at 344.

In November 2003, imaging revealed degenerative changes of the lumbar spine with intervertebral disk space narrowing at L5-S1 and L2-3 and joint space narrowing of the left hip with osteophyte formation. Tr. at 913. The imaging showed no radiographic evidence of fracture, bone lesions, or loss of vertebral body height. Tr. at 913.

In May 2004, Mona D. Justo, M.D., a pain specialist, evaluated Plaintiff for complaints of low back pain and groin pain. Tr. at 784-88. Plaintiff reported that she had a compression fracture of the lumbar spine at age 17, but she stated that her complaints of low back and groin pain were only from the last three years. Tr. at 784. Plaintiff reported smoking a pack of cigarettes per day. Tr. at 785. Plaintiff admitted to occasional alcohol use but denied a history of alcohol abuse. Tr. at 785. Plaintiff denied any history of illegal narcotics or cocaine use. Tr. at 797. Dr. Justo noted that Plaintiff appears to have adequate range of motion when she is distracted, but when she is asked

to perform range of motion, Plaintiff exhibits a fair amount of pain behavior. Tr. at 786. Dr. Justo found that even light pressure on the skin produces an exaggerated amount of pain, and she found Plaintiff positive for Waddell's sign. Tr. at 787. Dr. Justo diagnosed Plaintiff with pain magnification. Tr. at 788.

In September 2004, Plaintiff tested positive for THC (marijuana). Tr. at 909.

### (4) Review of Record from 2005 through 2007

While the appeal was pending before this Court, Plaintiff again applied for supplemental security income on April 13, 2005, alleging disability alleging disability as of April 13, 2005, due to asthma, bronchitis, back / hip arthritis, ovarian cysts, chronic obstructive pulmonary disease "COPD," fibromyalgia, bursitis, carpal tunnel of both arms, osteoarthritis, degenerative arthritis, low blood sugar with diabetic tendencies, pleurisy of the lungs, clinic depression, and mobility problems. Tr. at 670-73, 681-85.

In May 2005, Larry Legg, M.A., a licensed psychologist, evaluated Plaintiff for a mental status examination. Tr. at 804-08. Plaintiff presented herself with a cane for the evaluation and said that she needed to use a walker to ambulate. Tr. at 804. Plaintiff reported to Dr. Legg that she has had severe fibromyalgia since age 17. Tr. at 805. Mr. Legg noted that Plaintiff is taking the narcotic drugs Lortab and hydrocodone for pain. Tr. at 806. Plaintiff reported that she "drank alcohol at a very early age and for a long time. I'll still have one beer every now and then. I only drank socially though. It was never a problem." Tr. at 806. Plaintiff admitted that she used crack cocaine for a couple years but said she was clean for two years before moving to West Virginia. Tr. at 806. The ALJ noted that Plaintiff indicated that she had never been subject to any criminal charges. Tr. at 587 (ALJ decision); Tr. at 806-07 (mental evaluation). Plaintiff stated that her most recent employment

was "at the welfare office. I was a welfare check recipient. They made me do it. I issued travel vouchers and did odds and ends for about six months and that was in 2000." Tr. at 807. Prior to that, "I worked off my check at the city municipal building in Webster Springs. I was an assistant to the secretary of the mayor." Tr. at 807.

In June 2005, Dr. Sabio examined Plaintiff for the Disability Determination Service, regarding complaints of shortness of breath, low back pain, and pain in all joints. Tr. at 809-13. Plaintiff reported to Dr. Sabio that she broke her back when she was 17 years old, and that she was in a body brace. Tr. at 809. Plaintiff said her back worsened about five years ago, at the time she was diagnosed with fibromyalgia. Tr. at 812. Plaintiff stated that "working" really makes her back hurt. Tr. at 810. Dr. Sabio reported that Plaintiff walked with a normal gait, without the use of any ambulatory aids. Tr. at 811. The ALJ noted that despite using a cane during her recent May 2005 psychological evaluation and despite reporting to the psychologist that she needed to use a walker to ambulate, Dr. Sabio indicated that during the June 2005 medical evaluation, Plaintiff was able to walk with a normal gate and without the use of ambulatory aids. Tr. at 579 (ALJ decision); Tr. at 804 (May 2005 psychological evaluation); Tr. at 811 (Sabio report).

At the June 2005 examination, Plaintiff told Dr. Sabio that she is so short of breath that she can only walk one block before stopping. Tr. at 812. She said she smokes one and a half packs of cigarettes per week. Tr. at 812. The ALJ noted that Plaintiff continues to smoke against medical advice. Tr. at 582. Specifically, medical personnel advised Plaintiff to stop smoking in September 2001, August 2002, July 2003, and August 2004. Tr. at 173, 184, 884, & 899.

At the June 2005 examination, Dr. Sabio noted that Plaintiff's breathing was effortless; she did not have any accessory muscle recruitment; she did not have wheezing, rales, or rhonci; there

was no intercostal muscle retractions; and she was not in respiratory failure.  Tr. at 812.  Dr. Sabio reported that Plaintiff howled with pain at the slightest touch of her spine, but he did not find any muscle spasm, rigidity, atrophy, or weakness.  Tr. at 811 & 813.  Plaintiff had full hip flexion and was able to squat fully and walk on her heels, toes, and heel-to-toe in tandem.  Tr. at 812.  Plaintiff was able to sit without any discomfort with her back perpendicular and her hips bent at 90 degrees, even with her feet extended out.  Tr. at 813.

In October 2005, Plaintiff had a psychiatric evaluation with Lois A. Urick, M.D., of Seneca Health Services.  Tr. at 844-45.  Plaintiff related having two "mental breakdowns;" the first "after I found out I was raped as a child for four years" by a friend of the family.  Tr. at 844.  After discovering this, Plaintiff went "on a drunken binge for months."  Tr. at 844.  Plaintiff said she had a second breakdown in February 2004 "after my ex-boyfriend almost raped my daughter."  Tr. at 844.  Plaintiff reported no other substance abuse other than the use of alcohol.  Tr. at 844.  The ALJ noted that Plaintiff failed to report her prior significant use of marijuana and crack cocaine.  Tr. at 584.  Plaintiff said she broke her back at age 12, that she was temporarily paralyzed, and that she had to be in a brace for two years.  Tr. at 844.

In December 2005, for social history, Plaintiff admitted to using THC (marijuana) occasionally.  Tr. at 873.

In July 2006, a psychiatrist evaluated Plaintiff for welfare medical eligibility.  Tr. at 926.  The psychiatrist diagnosed Plaintiff with a "major depressive disorder" and found that her "ability to maintain employment is affected by mental illness."  Tr. at 926.  A physician also evaluated Plaintiff for welfare medical eligibility and found she did not have any physical disabilities.  Tr. at 929-30.

In August 2006, a psychiatrist evaluated Plaintiff for welfare medical eligibility and found that Plaintiff was mentally disabled. Tr. at 927-28.

In September 2006, imaging showed a degenerative change in lumbosacral junction and the hips bilaterally with no definite acute bone or joint abnormality. Tr. at 944. Imaging of the lumbar spine showed minimal dextroscoliosis with degenerative change throughout the mid and lower lumbosacral spine. Tr. at 944. Intervertebral disc spaces were well preserved with no acute bone or joint abnormality. Tr. at 944. The ALJ found that the imaging studies in the record fail to support Plaintiff's allegation of a prior broken back or prolonged paralysis. Tr. at 579.

In November 2006, at a follow-up appointment at the Webster County Memorial Hospital, Plaintiff was advised that the hospital would no longer prescribe her narcotics but she could find another physician. Tr. at 931.

In December 2006, Plaintiff had a follow-up appointment with Seneca Health Services, and her depression was diagnosed as "in remission." Tr. at 966.

In January 2007, Plaintiff had a psychological evaluation with Chameleon Health Care. Tr. at 978. Plaintiff stated that her longest employment was for three years working as a sales clerk at Dairy Mart. Tr. at 978. Plaintiff said she left this position in 1997 to relocate to West Virginia. Tr. at 978. While she was employed, Plaintiff was able to get along well with supervisors and coworkers. Tr. at 978. The psychologists gave Plaintiff a MMPI-2 personality inventory test, but they invalidated the results due to an unusually elevated "F" score. Tr. at 984. The psychologists IQ tested Plaintiff and reported a verbal IQ of 72; a performance IQ of 73; and a full scale IQ of 70. Tr. at 983. The ALJ noted that Plaintiff's 2007 IQ results differ so markedly from the 2003 results (verbal 90; performance 98; and full scale 93), "as to border upon the absurd." Tr. at 588 (ALJ

decision); Tr. at 311 (2003 psychological report).

### (5)  Plaintiff's Secondary Sources of Gain or Motivation and Inconsistencies in Reporting Substance Abuse History

The ALJ found that secondary sources of gain or motivation and inconsistencies in reporting substance abuse history undermine Plaintiff's credibility. Tr. at 582-83. Specifically, the ALJ found that the record demonstrates a long-term reliance on addictive opiate pain medications (absent objective evidence establishing a need for narcotics); that Plaintiff has been inconsistent in reporting her history of substance abuse; and that she has a disinclination to perform work activity. Tr. at 581-83.

> [A]n ALJ can discount subjective complaints if there are inconsistencies in the record as a whole... [I]nconsistencies exist in the record which could justify discounting [the plaintiff's] testimony regarding the severity of his injury. One of the primary inconsistencies related to [the plaintiff's] motivation for seeking disability benefits...We agree with the ALJ that there is a "strong element of secondary gain in this case" and that [the plaintiff's] conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity. *See Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir.1996) (emphasis added).

> *See also Frey v. Bowen*, 816 F.2d 508, 516 (10th Cir.1987) (*citing Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (subjective pain must be evaluated with due consideration for credibility, motivation, and medical evidence); *see also Pennington v. Chater*, 113 F.3d 1246 (10th Cir. 1997) (administrative law judge noted that the plaintiff's testimony exhibited embellishment, exaggeration, and a strong secondary gain motive and questions of credibility are correctly left to the fact finder [ALJ]) (emphasis added).

### (a)  Plaintiff's Long-Term Reliance on Narcotic Medications and Inconsistencies in Reporting Substance Abuse History

The ALJ found that Plaintiff has a secondary gain or motivation of long-term reliance on addictive opiate pain medications, absent objective evidence establishing a need for narcotics. Tr.

at 582-83. Plaintiff has been routinely prescribed narcotic drugs such as Lortab, Darvocet, and Hydrocodone. *See* Tr. at 188 (August 2001); 146 (October 2001); 157 (April 2002); 238 (August 2002); 264 (November 2002); 305 (May 2003); Tr. at 124 (July 2003); 785 (May 2004); 806 (May 2005); 810 & 842 (June 2005); 845 (October 2005); 924 (February 2006); 871 (March 2006); Tr. at 937 (October 2006). In November 2006, at a follow-up appointment at the Webster County Memorial Hospital, Plaintiff was advised that the hospital would no longer prescribe her narcotics but that she could find another physician. Tr. at 931. The ALJ noted that long-term narcotic medications are usually contraindicated for fibromyalgia. Tr. at 578.

In addition, Plaintiff has made inconsistent statements concerning her substance abuse history. In August 2002, she had a mental status exam with Sharon Joseph, Ph.D. Tr. at 237-39. Plaintiff admitted to Dr. Joseph that she does drink alcohol occasionally despite being treated for alcohol dependence when she was 18 years old. Tr. at 238. She also stated that she was arrested for contributing to the delinquency of minors after having a party with teenagers present who had brought their own beer. Tr. at 238. She said she did not know they were minors, but the parents were concerned and brought criminal charges. Tr. at 238. Plaintiff acknowledged that in her 20's she used illegal drugs, primarily marijuana, but she said that she had not used illegal drugs since that time. Tr. at 238.

In May 2003, Plaintiff's counsel referred her to Cardinal Psychological Services for a psychological evaluation. Tr. at 309. Plaintiff reported to the psychologists that she was charged with possession of marijuana in 2001 and received six months probation. Tr. at 310. The ALJ noted that Plaintiff would have been in her "40's" in 2001, which contradicts her earlier statement that she had not used illegal drugs since her "20's." Tr. at 583-84. The ALJ also noted that Plaintiff

failed to report to the psychologists regarding her prior arrest for contributing to the delinquency of minors. Tr. at 584.

In May 2004, Mona D. Justo, M.D., evaluated Plaintiff. Tr. at 784-88. Plaintiff admitted to Dr. Justo regarding her occasional alcohol use but denied a history of alcohol abuse. Tr. at 785. Plaintiff denied any history of illegal narcotics or cocaine use. Tr. at 797.

In September 2004, Plaintiff tested positive for THC (marijuana). Tr. at 909.

In May 2005, a licensed psychologist, evaluated Plaintiff for a mental status examination. Tr. at 804-08. Plaintiff reported to the psychologist that she "drank alcohol at a very early age and for a long time. I'll still have one beer every now and then. I only drank socially though. It was never a problem." Tr. at 806. Plaintiff admitted that she used crack cocaine for a couple years but said she was clean for two years before moving to West Virginia. Tr. at 806. The ALJ noted that Plaintiff indicated that she had never been subject to any criminal charges. Tr. at 587 (ALJ decision); Tr. at 806-07 (mental evaluation).

In October 2005, Plaintiff had a psychiatric evaluation with Lois A. Urick, M.D., of Seneca Health Services. Tr. at 844-45. Plaintiff related going "on a drunken binge for months" after a "mental breakdown." Tr. at 844. Plaintiff reported no other substance abuse other than the use of alcohol. Tr. at 844. The ALJ noted that Plaintiff failed to report her prior significant use of marijuana and crack cocaine. Tr. at 584.

In December 2005, for social history, Plaintiff admitted to using THC (marijuana) occasionally. Tr. at 873.

From a review of the record, substantial evidence supports the ALJ's finding that Plaintiff has a secondary source of gain or motivation in taking narcotic medications and that Plaintiff has

been inconsistent in reporting her substance abuse history, which undermines her credibility.

### (b)        Plaintiff's Disinclination to Perform Work Activity

From a review of the record, the ALJ found that Plaintiff has a secondary gain or motivation due to a disinclination to perform work activity. Tr. at 581-83. In 1997, Plaintiff worked at the welfare office through the West Virginia Works program, in order to "work off [her] welfare check." Tr. at 78, 807, & 1071. In April and December 1997, Plaintiff obtained a doctor's note to exempt herself from the work program due to "an acute flare up of illness" and "chronic lung disease." Tr. at 212-13. Plaintiff also stated that she could no longer work at the welfare office due to "painful arthritis" and "chronic pain." Tr. at 78 & 1071-72.

In May 2003, Plaintiff's counsel referred her to Cardinal Psychological Services for a psychological evaluation. Tr. at 309. Plaintiff reported that she last worked as a clerk at a Dairy Mart in Ohio for a year and a half. Tr. at 310. She said that she has also been a bartender "everywhere" for twenty years. Tr. at 310. The ALJ noted that income tax records do not show Plaintiff's bartending employment, which indicates that this work must have been performed "under the table." Tr. at 581.

In May 2005, a psychologist evaluated Plaintiff for a mental status examination. Tr. at 804-08. Plaintiff stated that her most recent employment was "at the welfare office. I was a welfare check recipient. They made me do it. I issued travel vouchers and did odds and ends for about six months and that was in 2000." Tr. at 807. Prior to that, "I worked off my check at the city municipal building in Webster Springs. I was an assistant to the secretary of the mayor." Tr. at 807.

In June 2005, Dr. Sabio examined Plaintiff for the Disability Determination Service, regarding complaints of shortness of breath, low back pain, and pain in all joints. Tr. at 809-13.

Plaintiff told Dr. Sabio that "working" really makes her back hurt.  Tr. at 810.

In January 2007, Plaintiff had a psychological evaluation.  Tr. at 978.  Plaintiff stated that her longest employment was for three years working as a sales clerk at Dairy Mart.  Tr. at 978. Plaintiff said she left this position in 1997 to relocate to West Virginia.  Tr. at 978.  While she was employed, Plaintiff was able to get along well with supervisors and coworkers.  Tr. at 978.

The ALJ noted that the record reflects Plaintiff's disinclination to perform work activity, even prior to the onset of her alleged disability.  Tr. at 581-83.  Employment and wage records dating back to 1974 indicate that Plaintiff has never earned more than $7200 in a year, and that she has reported less than $10,000 total earnings over the last 20 years.  Tr. at 72 & 676.  After Plaintiff quit her job in 1997 to "relocate" to West Virginia, she has invested herself entirely in the pursuit of state welfare assistance and social security disability benefits.  Tr. at 582.  The ALJ found that Plaintiff has not made any significant effort within the last 10 years to seek gainful employment to accommodate any of her legitimate impairment related limitations.  Tr. at 582.  The ALJ noted that Plaintiff's statement to the evaluating physician in May 2005 (that she has been "fighting" for [disability benefits] for four years) reflects Plaintiff's steadfast commitment to receive disability and avoid work activity.  Tr. at 583 (ALJ decision); Tr. at 805 (medical report).

From a review of the record, substantial evidence supports the ALJ's finding that Plaintiff has a secondary source of gain or motivation due to a disinclination to perform work activity, which undermines her credibility.

### (6)    Credibility Conclusion by the ALJ

The ALJ did not find Plaintiff credible based on the evidence in the record.  Tr. at 588.  The ALJ found that Plaintiff's longitudinal complaints are inconsistent and are provided in the context

of multiple sources of secondary gain. Tr. at 588. Plaintiff has been inconsistent in reporting her history of substance abuse, and she has relied significantly on addictive opiate pain medications, absent objective evidence establishing a need for narcotics. Tr. at 582-83 & 588. Plaintiff asserted her inability to work in 1997 due to "lung disease," but has continued to smoke against medical advice. Tr. at 588. The ALJ found that in the span of Plaintiff's three disability filings, her complaints have escalated dramatically. Tr. 582. In 2001, Plaintiff alleged asthma, arthritis of the left hip, and severe pain. Tr. at 68-71 & 78. In 2002, Plaintiff alleged musculoskeletal impairments, degenerative hips, hands, lungs; a mental [impairment]; rheumatoid and osteoarthritis; mobility issues; chronic pain; depression; and asthma. Tr. at 54. In 2004, Plaintiff alleged she broke her back as a child, but no objective evidence supported this allegation and she failed to allege this impairment previously. Tr. at 579 (ALJ decision); Tr. at 913 & 944 (medical reports). In 2005, Plaintiff alleged asthma, bronchitis, back / hip arthritis, ovarian cysts, chronic obstructive pulmonary disease "COPD," fibromyalgia, bursitis, carpal tunnel of both arms, osteoarthritis, degenerative arthritis, low blood sugar with diabetic tendencies, pleurisy of the lungs, clinic depression, and mobility problems. Tr. at 670-73, 681-85. The ALJ noted that Plaintiff has been diagnosed with symptom magnification. Tr. at 588 (ALJ decision); Tr. at 788, 811, & 813 (medical reports). In addition, her IQ scores inexplicably dropped 20 points in a four year time span, and Plaintiff could not have obtained higher scores by accident. Tr. at 588 (ALJ decision); Tr. at 311 (psychological report).

Therefore, from the evidence in the record, substantial evidence supports the ALJ's finding that Plaintiff is not credible.

### b.       The ALJ's New Severe Impairments Finding

In the 2003 ALJ decision, the ALJ found Plaintiff to have the following severe impairments: fibromyalgia, osteoarthritis of the hips, bronchial asthma, chronic obstructive pulmonary disease, adjustment disorder with depressed mood, and chronic pain syndrome. Tr. at 30.

In the 2007 ALJ decision now before this Court, the ALJ found Plaintiff to have the following severe impairments: "mild" degenerative arthritis / disc disease of the lumbar spine; degenerative arthritis / joint disease, bilateral hips; equivocal "mild" inflammatory arthritis / "fibromyalgia," by report; history of asthma / bronchitis; adjustment disorder with depressed mood; and history of polysubstance abuse (including alcohol, crack cocaine, and marijuana). Tr. at 577-78.

Plaintiff contends that the ALJ should have made the same severe impairments finding as the prior 2003 ALJ decision. Pl. Doc. 12 at 7-8. Plaintiff argues that the remand order by this Court essentially affirmed the ALJ's decision in all respects except for the "listing" impairment finding under Step Three. Pl. Doc. 12 at 6. The Commissioner responds that the ALJ was entitled to make a new severe impairments finding because Plaintiff alleged new impairments in her 2005 application, and the parties also received new evidence. Comm'r Doc. 16 at 9-10. Plaintiff acknowledged that four years of new evidence had accumulated after the 2003 decision. Pl. Doc. 12 at 2.

> The SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability. At each decision making level, the agency recognizes the traditional rule that, absent an identity of claims, principles of claim preclusion (historically referred to as *res judicata*) do not apply...*Cf. Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir. 1996) (in light of a four-year interval between applications, differing conclusions concerning the claimant's residual functional capacity were "entirely plausible").

*See Albright v. Commissioner of Social Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999). Therefore, Plaintiff's second application, alleging new impairments from a new disability date of April 13, 2005, combined with the receipt of four years of new evidence (including additional evidence from prior years), enabled the ALJ to come to a different conclusion than the prior decision. Substantial evidence supports the ALJ's new severe impairments finding.

### 3. Step Three: Determine whether the Plaintiff has a "Listed" Impairment

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

> The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

> Most of the listed impairments are permanent or expected to result in death. *See* 20 C.F.R. § 404.1525(a).

> We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s). *See* 20 C.F.R. § 404.1513(a).

> To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing. *See* 20 C.F.R. § 404.1513(a) (emphasis added).

> ***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***. *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

The ALJ evaluated the record to determine whether Plaintiff meets or equals the listing impairment criteria for 1.00 Musculoskeletal System, 1.02 Major dysfunction of a joint(s), 1.04 Disorders of the spine, 3.00 Respiratory System, 11.00 Neurological, 12.00 Mental Disorders, 12.04 Affective Disorders, and 12.09 Substance Addiction Disorders. Tr. at 578. Following a review of

the record and an evaluation of Plaintiff's credibility, the ALJ found that she does not meet or equal a listing impairment. Tr. at 578.

### a. Listing Impairments 1.00, 1.02, 1.04, 3.00, 11.00, and 14.09

In November 2003, imaging studies revealed degenerative changes of the lumbar spine with intervertebral disk space narrowing at L5-S1 and L2-3 and joint space narrowing of the left hip with osteophyte formation. Tr. at 913. The images did not show any evidence of fracture, bone lesions, or loss of vertebral body height. Tr. at 913.

In May 2004, Mona D. Justo, M.D., a pain specialist, evaluated Plaintiff for complaints of low back pain and groin pain. Tr. at 784-88. Dr. Justo noted that Plaintiff appears to have adequate range of motion when she is distracted, but when she is asked to perform range of motion, Plaintiff exhibits a fair amount of pain behavior. Tr. at 786. Dr. Justo found that even light pressure on the skin produces an exaggerated amount of pain, and she found Plaintiff positive for Waddell's sign. Tr. at 787. Dr. Justo diagnosed Plaintiff with pain magnification. Tr. at 788.

In September 2006, imaging showed a degenerative change in lumbosacral junction and the hips bilaterally with no definite acute bone or joint abnormality. Tr. at 944. Imaging of the lumbar spine showed minimal dextroscoliosis with degenerative change throughout the mid and lower lumbosacral spine. Tr. at 944. Intervertebral disc spaces were well preserved with no acute bone or joint abnormality. Tr. at 944. Dr. Saikali found that the "x-rays do not correlate with the symptoms all the time." Tr. at 344. Moreover, Dr. Saikali opined that Plaintiff did not meet the criteria for Listing 1.02A. Tr. at 335-44. The ALJ concluded that the objective evidence does not support a "listing level" musculoskeletal impairment. Tr. at 579.

Plaintiff alleges that the ALJ omitted Listing 14.09D Inflammatory Arthritis. Pl. Doc. 12

at 9.  While the ALJ did not specifically list this impairment by number in his decision, he did evaluate whether Plaintiff met the criteria for listing level arthritis and rejected that allegation.  Tr. at 578-79.  The ALJ found that the objective evidence does not support Plaintiff's allegations of rheumatoid arthritis.  Tr. at 578.  Blood tests for rheumatoid factor and ANA were negative.  Tr. at 305.  In addition, Dr. Saikali reported that Plaintiff "does not have severe arthritis in one particular joint."  Tr. at 579 (ALJ decision); Tr. at 344 (Saikali report).

Plaintiff contends that the ALJ should consider that the West Virginia Medical Institute (WVMI) approved her for "in home" services due to her alleged disability.  Pl. Doc. 12 at 10; Tr. at 969-77.  However, the ALJ did consider this and refused to rely on it for support of Plaintiff's allegations because of her lack of credibility.  Tr. at 587.

Plaintiff alleges that even if she does not meet a listing, she may nevertheless "equal" a listing due to her diagnosis of fibromyalgia.  Pl. Doc. 12 at 14-15.  However, fibromyalgia requires a credible informant because the diagnosis is based upon subjective complaints, and the ALJ did not find Plaintiff credible.  Tr. at 578.  Therefore, the ALJ found that Plaintiff did not "equal" a listing due to a lack of credibility and objective evidence.  Tr. at 586.

Plaintiff states that the ALJ erred by failing to obtain an updated medical expert opinion pursuant to SSR 96-6p.  Pl. Doc. 12 at 15.

> When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is *not equivalent* in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.  However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:
>
> *When* no additional medical evidence is received, but in the opinion

of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that *a judgment of equivalence may be reasonable*; or

*When additional medical evidence is received that* in the opinion of the administrative law judge or the Appeals Council *may change the State agency medical or psychological consultant's finding* that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*See* SSR 96-6p (italics added). Therefore, the Social Security Rulings require an updated medical expert opinion if the ALJ finds that Plaintiff may equal a listing or if new medical evidence may change a state medical consultant opinion. In this case, the ALJ did not find that Plaintiff may equal the listing or that any new evidence would change a state consultant opinion. Accordingly, the ALJ was not required to obtain an updated medical expert opinion.

Substantial evidence supports the ALJ's decision that Plaintiff does not meet or equal the criteria for a listed impairment under 1.00, 1.02, 1.04, 3.00, 11.00, or 14.09.

### b. Listing Impairments 12.00, 12.04, and 12.09

The ALJ also found that Plaintiff does not meet the criteria for a listing level mental impairment. Tr. at 578, 580, & 588.

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months...medical source evidence should reflect the medical source's considerations of information from you and other concerned persons who are aware of your activities of daily living; social functioning; concentration, persistence, or pace; or episodes of decompensation.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Mental Disorders). From a review of the record, the ALJ found that Plaintiff has not evidenced a listing level mental impairment for a duration of 12

consecutive months.  Tr. at 580.

In August 2002, Plaintiff had a mental status exam with Sharon Joseph, Ph.D.  Tr. at 237-39.
Dr. Joseph found that Plaintiff's socialization was normal and her concentration only "moderately"
impaired.  Tr. at 238.

In May 2003, Plaintiff's counsel referred her to Cardinal Psychological Services for a
psychological evaluation.  Tr. at 309.  At the May 2003 evaluation, Plaintiff reported that she has
been a bartender "everywhere" for twenty years.  Tr. at 310.  The ALJ found that this statement by
Plaintiff that she has been able to bartend for 20 years contradicts any purported long-term mental
illness or inability to be around others.  Tr. at 588.

At the May 2003 evaluation, the psychologists found that Plaintiff's concentration was
"good."  Tr. at 311.  However, the psychologists found that Plaintiff had several "marked"
limitations.  Tr. at 326, 330, & 332-33.  At the May 2003 evaluation, Plaintiff stated she had never
been hospitalized for emotional problems.  Tr. at 311.

In October 2005, Plaintiff had a psychiatric evaluation with Lois A. Urick, M.D., of Seneca
Health Services.  Tr. at 844-45.  Plaintiff related having two "mental breakdowns."  Tr. at 844.
After discovering the first "breakdown," Plaintiff went "on a drunken binge for months."  Tr. at 844.

The Cardinal psychologists as well as Dr. Urick found Plaintiff mentally impaired since June
2001, even though Plaintiff did not allege a mental impairment when applying for disability in 2001.
Tr. at 586 (ALJ decision); Tr. at 316-34 & 544-64 (psychological reports).  Plaintiff did not allege
a mental impairment until July 2002.  Tr. at 54 (request for reconsideration); Tr. at 581 (ALJ
decision).

In December 2006, Plaintiff had a follow-up appointment with Seneca Health Services, and

her depression was diagnosed as "in remission."  Tr. at 966.

In January 2007, Plaintiff had a psychological evaluation with Chameleon Health Care.  Tr. at 978.  Plaintiff stated that her longest employment was for three years working as a sales clerk at Dairy Mart.  Tr. at 978.  Plaintiff said she left this position in 1997 to relocate to West Virginia.  Tr. at 978.  While she was employed, Plaintiff was able to get along well with supervisors and coworkers.  Tr. at 978.  The psychologists gave Plaintiff a MMPI-2 personality inventory test, but they invalidated the results due to an unusually elevated "F" score.  Tr. at 984.  The psychologists IQ tested Plaintiff and reported a verbal IQ of 72; a performance IQ of 73; and a full scale IQ of 70.  Tr. at 983.  The ALJ noted that Plaintiff's 2007 IQ results differ so markedly from the 2003 results (verbal 90; performance 98; and full scale 93), "as to border upon the absurd."  Tr. at 588 (ALJ decision); Tr. at 311 (2003 psychological report).

The ALJ found that the evidence in the record does not establish that Plaintiff has "marked" deficiencies or experienced episodes of decompensation.  Tr. at 587-88.  The ALJ found that Plaintiff failed to establish 12 consecutive months of a mental impairment.  Tr. at 586.  The ALJ rejected the psychological opinions finding tha Plaintiff met the criteria for a listed mental impairment because the psychologists based their opinions, at least in part, on Plaintiff's credibility.  Tr. at 587-88.  The ALJ previously found Plaintiff an unreliable informant due to her inconsistent manner of reporting her substance abuse history; her long-term reliance on addictive opiate pain medications (absent objective evidence establishing a need for narcotics); her disinclination to perform work activity; her inconsistent allegations concerning a "broken back;" her progressively escalated allegations of disability; and her inexplicable 20 point drop in IQ scores.  Tr. at 587-88.

Substantial evidence supports the ALJ's decision that Plaintiff does not meet or equal the

criteria for a listed mental impairment under 12.00, 12.04, or 12.09.

**\* Residual Functional Capacity Assessment \***
**(Needs to be Determined Before Proceeding to Step Four)**

If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ reviewed Plaintiff's medical evidence, severe impairments, physical and mental limitations, pain symptoms, daily activities, and credibility; and from the entire record, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work. Tr. at 580.

*Light work* involves lifting no more than 20 pounds at a time with

frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work...

*Sedentary work* involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met...If someone can do light work, we determine that he or she can also do sedentary work.

*See* 20 C.F.R. § 404.1567 (italics added). Specifically, the ALJ found that Plaintiff has the residual functional capacity to perform, within a clean air environment, a range of work activity that: requires no more than a "light" level of physical exertion; affords opportunity for brief, one to two minute changes of position at least every half-hour; requires no climbing of ladders, ramps, ropes, scaffolds or stairs; requires no overhead lifting or reaching; requires no crawling or kneeling, or more than occasional balancing, crouching or stooping; entails no concentrated exposure to temperature extremes, excessive humidity / wetness or respiratory irritants (e.g. dust, fumes, gases, noxious odors, smoke); entails no exposure to hazards (e.g., dangerous moving machinery, unprotected heights); requires no close concentration or attention to detail for extended periods; involves no fast-paced or assembly line type of duties; entails no interaction with the general public; presents no more than occasional changes in the work setting; requires no travel as part of the job; and accommodates up to one unscheduled workday absence per month. Tr. at 580.

The ALJ found that the residual functional capacity finding that Plaintiff can perform light

work involving simple routine activities fully accommodates any of Plaintiff's psychological symptoms, joint space narrowing, and other equivocal findings. Tr. at 578-79 & 586-87. Substantial evidence supports the ALJ's residual functional capacity assessment that Plaintiff can perform light work.

**4.      Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work**

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.
> 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.
> 20 C.F.R. § 404.1560(b).
>
> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled.
> *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform her past relevant work as a cashier because her former job entails levels of sustained concentration and interpersonal demand that exceeds her residual functional capacity. Tr. at 588-89. The parties do not dispute the ALJ's findings in Step Four.

**5.** **Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

> At the fifth and last step...
>
> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony to determine whether Plaintiff could perform any other work.

The ALJ noted that Plaintiff was 43 to 49 years old during the period at issue, which makes her a younger individual as defined in the Social Security Act. Tr. at 589. *See* 20 C.F.R. § 404.1563 (age as a vocational factor). The ALJ found that Plaintiff obtained a General Educational Development "GED" degree and her job skills are not transferable. Tr. at 589. *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* 20 C.F.R. § 416.968(d) (transferability of job skills).

Vocational Expert Larry Bell testified that someone with Plaintiff's residual functional capacity would be able to perform "light exertional" jobs such as an office assistant and laundry folder. Tr. at 1101-02. Mr. Bell stated that there were at least 2,425 of these types of jobs available regionally in West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania; and there

were 200,000 jobs available nationwide. Tr. at 1099 & 1102. Mr. Bell testified that Plaintiff could also perform "sedentary" jobs such as a machine tender or general sorter. Tr. at 1102. Mr. Bell stated that there were at least 650 of these types of jobs available regionally in West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania; and there were 50,000 jobs available nationwide. Tr. at 1099 & 1102.

After considering the Plaintiff's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ found that there are jobs that exist in the national economy that the Plaintiff could perform. Tr. at 590. Substantial evidence supports the ALJ's decision that Plaintiff could perform other work.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529. **Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599. "This Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock*, 483 F.2d at 775. **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added). Therefore, this reviewing Court will uphold the ALJ's decision that Plaintiff could perform other work because it is supported by substantial evidence.

In conclusion, the ALJ found that based on the Plaintiff's applications filed on October 15,

2001 and April 13, 2005, the Plaintiff is not entitled to a period of disability or supplemental security income. Tr. at 590. The Court finds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled and can perform other work in the national economy.

## III.     RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[15]**, **DENY** Plaintiff's Motion for Summary Judgment **[12]**, and **AFFIRM** the Decision of the Administrative Law Judge. The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Recommendation. The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the District Judge. Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: November 4, 2009**

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE