IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARY J. KANDEL,

            Plaintiff,

v.                              CIVIL ACTION NO. 1:09CV31
                                     (Judge Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

            Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Fed.R.Civ.P. 72(b), 4.01(d), the Court referred this Social Security action to United States Magistrate David J. Joel on February 12, 2009, with directions to submit proposed findings of fact and a recommendation for disposition.

On November 4, 2009, Magistrate Judge Joel filed his Report and Recommendation ("R&R"), in which he directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), to file any written objections with the Clerk of Court within ten (10) days following receipt of the R&R. On November 13, 2009, plaintiff, Mary J. Kandel ("Kandel"), by her attorney, Montie VanNostrand, filed objections to the R&R.

## I. PROCEDURAL BACKGROUND

Kandel first applied for supplemental security income ("SSI") on April 7, 1998, alleging continuing disability since June 30,

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

1996. On October 28, 1998, the Commissioner denied the claim, a denial Kandel did not appeal.

On October 15, 2001, Kandel filed a protective reapplication for SSI that alleged disability onset as of June 30, 2001, due to severe chronic asthma, arthritis "left hip gone – bone to bone," and severe pain with no relief of pain from medications. The Commissioner initially denied this claim on May 20, 2002, and upon reconsideration on October 16, 2002. Following a July 24, 2003 hearing before an ALJ, at which Kandel, represented by counsel, appeared and testified, the ALJ determined that she was not disabled and issued an unfavorable decision on August 14, 2003. On October 14, 2003, Kandel sought review of that decision, which the Appeals Council denied on July 16, 2004. Kandel then filed Civil Action No. 2:04-CV71 on September 29, 2004, seeking, review of the final decision.

While Civil Action No. 2:04CV71 was pending before the Honorable Robert E. Maxwell, Kandel filed another application for SSI on April 13, 2005, alleging disability due to back hip arthritis, osteoarthritis, degenerative arthritis, ovarian cysts, asthma, bronchitis, chronic obstructive pulmonary disease ("COPD)", bursitis, bilateral carpal tunnel syndrome, low blood sugar with

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

diabetic tendencies, pleurisy of the lungs, clinical depression, and mobility problems. The Commissioner denied the claim initially on July 14, 2005, and on reconsideration on January 26, 2006. Kandel requested a hearing on March 24, 2006.

Meanwhile, on January 6, 2005, Magistrate Judge Seibert recommended that Civil Action No. 2:04CV71, Kandel's 2003 case, be remanded to the ALJ "to consider explicitly and state the reasons for determining whether Claimant satisfies the pertinent listings of Appendix 1." Judge Maxwell adopted Magistrate Judge Seibert's R&R in whole on March 22, 2006, and remanded the case.

On April 12, 2006, the Appeals Council vacated the August 14, 2003 hearing decision and remanded the matter to the ALJ "for further proceedings consistent with the order from this Court." In doing so, the Appeals Council noted:

> The claimant filed a subsequent claim for
> Title XVI benefits on April 13, 2005. The
> Appeals Council's action with respect to the
> current claim renders the subsequent claim
> duplicate. Therefore, the Administrative Law
> Judge will associate the claim files and issue
> a new decision on the associated files.
>
> In compliance with the above, the
> Administrative Law Judge will offer the
> claimant the opportunity for a hearing, take
> any further action needed to complete the

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

administrative record and issue a new decision.

Administrative Record at 644-45. The Appeals Council therefore directed the ALJ to associate the 2003 and 2005 claim files and to issue a new decision on the associated claims. Id. at 645.

On February 22, 2007, an ALJ conducted a hearing at which Kandel, represented by counsel, appeared and testified. A vocational expert ("VE") also appeared and testified. On July 2, 2007, the ALJ determined that Kandel was not disabled as defined in the Social Security Act at any time since October 2001, the period at issue based on her October 15, 2001 and April 13, 2005 applications. On December 19, 2008, the Appeals Council affirmed the July 2, 2007 decision, thus making it the final decision of the Commissioner. On February 21, 2009, Kandel filed this action, requesting judicial review of the 2007 final decision denying her applications for disability.

## II. PLAINTIFF'S BACKGROUND

At the time of the hearing on July 24, 2003, Kandel was 45 years old and therefore is considered a "younger individual" pursuant to 20 CFR § 416.963. She has a high school equivalency

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

diploma, one year of college and a work history as a convenience

store clerk.

III.    ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process

prescribed in the Commissioner's regulations at 20 C.F.R.

§§ 404.1520, the ALJ made the following findings:

1.   Kandel has not engaged in substantial gainful
     activity at any time during the period at issue
     i.e., since October 2001;

2.   Kandel has mild degenerative arthritis/disc disease
     of the lumbar spine, degenerative arthritis/joint
     disease, bilateral hips, equivocal "mild"
     inflammatory arthritis/"fibromyalgia," by report,
     history of asthma/bronchitis, adjustment disorder
     with depressed mood, and history of polysubstance
     abuse, (including alcohol, crack cocaine and
     marijuana) that are considered "severe" based on
     the requirements in Regulation 20 CFR § 416.920(b)
     that, when considered individually or jointly, do
     not meet or medically equal one of the listed
     impairments in Appendix 1, Subpart P, Regulation
     No. 4;

3.   Kandel has the residual functional capacity to
     perform, within a clean air environment, a range of
     work activity that requires no more than a "light"
     level of physical exertion, affords opportunity for
     brief, one to two minute changes of position at
     least every half-hour with the following
     limitations: no climbing of ladders, ramps, ropes,

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

scaffolds or stairs, no overhead lifting or
reaching, no crawling or kneeling or more than
occasional balancing, crouching or stooping, no
concentrated exposure to temperature extremes,
excessive humidity/wetness or respiratory irritants
(e.g., dust, fumes, gases, noxious odors, smoke),
no exposure to hazards, (e.g., dangerous moving
machinery, unprotected heights), no close
concentration or attention to detail for extended
periods, no fast-paced or assembly line type of
duties, no interaction with the general public, no
more than occasional changes in the work setting,
no travel as part of the job, and accommodations up
to one unscheduled workday absence per month;

4.    Kandel is unable to perform any of the requirements
      of her "vocationally relevant past work" as a
      cashier (20 CFR § 404.1565);

5.    Kandel, throughout the period at issue, is
      considered a "younger individual" (20 CFR
      § 416.963);

6.    Kandel has the equivalent of a "high school"
      education and is able to communicate in English (20
      CFR § 416.964);

7.    Kandel has a "semi-skilled" employment background
      as a cashier but has acquired no particular work
      skills that are transferrable to any job that
      remains within her residual functional capacity (20
      CFR § 404.1568. 416.698 and Part 404, Subpart P,
      Appendix 2);

8.    Considering Kandel's age category, level of
      education, work experience and prescribed residual
      functional capacity, she remained capable
      throughout the period at issue of performing jobs
      that exist in significant numbers within the
      national economy (20 CFR §416.960(c) and 416.966));
      and

9.    Kandel was not under a "disability," as defined in
the Social Security Act, at any time since October
2001 the period at issue (20 CFR 416.920(g).

### IV.   PLAINTIFF'S OBJECTIONS

In her objections, Kandel contends that the magistrate judge
erred:

1)    by misstating her contention as being that the prior
remand order bound the Commissioner to the same severe impairments
finding contained in the 2003 decision, when, in fact, her actual
objection is that, as to the period prior to the first ALJ's
decision, the ALJ needed only to determine whether or not she met
or equaled a listed impairment, and that, pursuant to Albright v.
Commissioner of Social Sec. Admin., 174 F.3d 473 (4th Cir. 1999),
for the period after the first ALJ decision, the second ALJ was
required to weigh and make specific comparison findings, explaining
his departure from the prior sequential evaluation;

2)    in determining that substantial evidence supported the
ALJ's decision that she did not meet or equal a listed impairment,
including  1.00,  1.02,  1.04,  3.00,  11.00  and  14.09,  and  in
particular,  14.09D  Inflammatory  Arthritis,  as  it  relates  to
fibromyalgia;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

3)    in determining that substantial evidence supported the ALJ's residual functional capacity ("RFC") finding; and

4)    in determining that substantial evidence supported the ultimate conclusion that she is not disabled and can perform other work in the national economy.

## V.  MEDICAL EVIDENCE

The relevant evidence includes the following extensive medical records:

1.    A March 14, 2001 report from Webster County Memorial Hospital ("WCMH") indicating continuing problems with arthritis, an increase in hip pain, a limping gait, decreased range of motion in the left hip and a diagnosis of exacerbation of left hip osteoarthritis;

2.    An April 5, 2001, evaluation from Richard E. Topping, M.D., indicating bilateral hip pain, toe rise and heel stand without difficulty, negative right straight leg raise test, painful left straight leg raise test, and significant trochanteric pain on the left to palpation. Dr. Topping's impression was left side trochanteric bursitis and osteoarthritis of the left hip. He recommended continuing physical therapy and anti-inflammatories,

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

diagnostic blood work for rheumatoid arthritis including a sed rate and administered a trochanteric bursa injection;

3.    An April 25, 2001 report from WCMH, indicating knee and hip pain, a limping gait, a diagnosis of arthnalgics, treatment with Afrin 250 and a recommendation for an consultation with Dr. Topping;

4.    An April 26, 2001 report from Laboratory Corporation of America ("LabCorp"), indicating negative results for Rheumatoid Arthritis Factor in all staining patterns including Anti-Centromere;

5.    A May 24, 2001 report from WCMH, indicating "a lot of hip pain still", a diagnosis of osteoarthritis, trial of Vioxx and a follow-up appointment in one month;

6.    A June 27, 2001 report from WCMH, indicating a lot of hip and leg pain. A diagnosis of arthritis and asthma, treatment with Vioxx 25 mg and Vistaril and a notation that Kandel is unable to work due to arthritis;

7.    An August 7, 2001 report from WCMH, indicating worsening hip pain, a diagnosis of osteoarthritis in hips, asthma, anxiety, Vistaril increased to 50 mg, Darvocet continued and given Levaquin;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

8. A September 26, 2001 report from WCMH, indicating increased pain in left hip controlled with Darvocet, a diagnosis of COPD, resolving pneumonia and hypoglycemic diet, directions to increase Advair to 250/50, continue walking, follow diet and consult dietician;

9. A November 7, 2001 report from WCMH for a follow-up examination for injuries sustained in an altercation. Examination revealed the multiple contusions were healing;

10. A December 13, 2001 report from WCMH, indicating complaints of continuing left hip pain, difficulty walking, driving only short distances and no injuries reported. Examination revealed a limping gait, not unsteady, difficulty getting on and off the table, and marked pain in left hip with range of motion. A diagnosis of osteoarthritis left hip, severe pain and COPD. A recommendation for a trial of Voltarex, if no relief try Naprosyn, if no relief try Vioxx and possible follow-up appointment with Dr. Topping;

11. An April 18, 2002 x-ray from Mahoning Valley Imaging, indicating no acute cardiopulmonary process and moderate to marked degenerative changes in the left hip;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

12.  An April 24, 2002, report from Arturo Sabio, M.D.,
indicating complaints of arthritis pains, shortness of breath after
20 minutes of ambulation on level ground, inability to climb three
or four steps without resting, chronic cough, occasional hemoptsis,
frequent wheezing, and smoking three packs of cigarettes per week.
Dr. Sabio noted that Kandel walked with a normal gait, did not
require ambulatory aids, had no muscle atrophy or weakness,
reported no back injury, had diminished breath sounds and
expiratory wheezing in the lower lung fields, did not have labored
breathing, no cyanosis, no accessory muscle recruitment, was not in
respiratory failure, had tenderness on the left hip and both knees,
had joint swelling and tenderness in the proximal interphalangeal
joints of both hands, tenderness in the lumbar spine, and
experienced pain on left hip on straight leg raising to 90 degrees.
His diagnosis was osteoarthritis, bronchial asthma and chronic
obstructive lung disease;

13.  A May 5, 2002, RFC assessment from Timothy Huffman,
indicating ability to lift 50 pounds occasionally and 25 pounds
frequently, stand or walk with normal breaks about six hours in an
eight hour workday, sit about six hours in an eight hour workday,
unlimited push or pull no postural, manipulative, visual or

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

communicative limitations, and unlimited environmental limitations except must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. Huffman reduced the RFC to medium based on chronic pain secondary to arthritis and decreased range of motion;

14.  A June 11, 2002 report from WCMH, indicating "still a lot of left hip pain and trying to get disability". A diagnosis of left hip pain, osteoarthris and COPD and continuation of same treatment;

15.  A July 30, 2002 report from WCMH, indicating complaints of decreased sleep, constant pain, feeling depressed and osteoarthrtis acting up. Examination revealed decreased range of motion with pain on rotation, a diagnosis of depression, arthralgias and osteosrthritis and treatment with Celexa and direction for follow-up appointment in six to eight weeks;

16.  An August 30, 2002 mental status examination report from Sharon Joseph, Ph.D., indicating a reported medical history of treatment for asthma, arthritis, depression, chronic pain, hypoglycemia, a hernia operation at age 7, chronic bronchitis from birth, frequent pneumonia as a child until approximately age 11 or 12, osteoarthritis and rheumatoid arthritis. A diagnostic impression of Axis I adjustment disorder with depressed mood, Axis

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

II deferred and Axis III asthma, osteoarthritis, chronic pain and hypoglycemia, as reported by Kandel. Dr. Joseph noted the psychological prognosis as fair with ongoing treatment for depression and chronic pain but that only a doctor could provide a medical prognosis;

17. A September 17, 2002, bilateral hip x-ray, indicating no lytec or sclerotic bone lesions, no fracture, or dislocation. The impression noted joint space narrowing, subchondral sclerois, geode formation, and central migration of both femoral heads, which may represent rheumatoid arthritis;

18. An October 9, 2002, Psychiatric Review Technique from Frank D. Roman, indicating an adjustment and pain disorder that did not precisely satisfy the diagnostic criteria with mild limitation to restriction of activities of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence or pace, and no episodes of decompensation;

19. A November 20, 2002, report from Wassim Saikali, M.D., Rheumatology and Pulmonary Clinic, indicating an impression of fibromyalgia, active and severe and possible inflammatory arthritis. Dr. Saikali noted:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

---

some tenderness over the right wrist and PIP.
However, no obvious synovitis. She reports her
blood tests were negative, but the x-ray
showed evidence of rheumatoid.  I told her to
bring me the x-ray.  Ideally she should be on
Plaquenil, but I would like to review the x-
rays prior to that. For the fibromyalgia,
aggressive  will  give  her  Darvocet  for
pain,. . .  for severe pain. Will put her on
Neurontin . . . to be increased to 800 mg . .
. . If she has rheumatoid arthritis, I will
start her on Plaquenil as she does not have a
lot of synovitis;

20.  A December 11, 2002, report regarding bilateral x-ray of

hands from Dr. Saikali, Rheumatology &  Pulmonary Clinic PLLC,

indicating inflammatory arthritis with soft tissue swelling around

the PIPs and recommendation to obtain clinical correlation of early

rheumatoid arthritis;

21.  A December 11, 2002 report from Dr. Saikali, indicating

that  he  had  reviewed  the  x-rays  and  noted  that  they  showed

"narrowing  and  osteoarthritis  of  both  hips  with  some  protrusio

acetabuli,  early  central  migration.  Could  be  suggestive  of  early

inflammatory arthritis". He increased the Neurontin to 400 mg and

then 600 mg, continued the Darvocet and started Plaquenil 200 mg;

22.  A January 3, 2003 report from WCMH, indicating continued

pain,  not  sleeping,  a  diagnosis  of  fibromyalgia,  COPD  and

depression and the addition of a prescription for Zyperexic;

23.   A February 3, 2003 report from WCMH, indicating continued pain, a diagnosis of arthritis in hips, depression, asthma, COPD and fibromyalgia and a prescription for Accolate;

24.   A March 13, 2003, office note from Dr. Saikali for a follow-up appointment for fibromyalgia, chronic pain and mild early inflammatory arthritis, indicating complaints of severe pain and discomfort involving the neck, shoulders, arms and hands that requires Darvocet. Examination revealed tenderness in the trapezis, nuchal area, lateral epicondyle, mild tenderness over the second and third PIP but no other synovitis. He noted that Kandel reported the pain limits her  activities, renders her unable to sleep well at night, and unable to function.  He further noted that she is seeking disability;

25.   An undated office note of Dr. Saikali, noting that Kandel's "degree of pain is more than the objective findings" and recommending additional blood tests and a bone scan, continuation of Plaquenil, an increase of the Neurontin and possible trial of Predisone  if  her  condition  does  not  improve  with  anti-inflammatories, stress management and exercises or treatment with Methotrexate if her condition does improve;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

26.  A May 13, 2003 office note from Dr. Saikali, indicating increased pain and stiffness involving the hands, knees and back and fatigue. He noted that all the blood tests for rheumatoid factor and ANA were negative and that he did not see any evidence of synovitis. Examination revealed minimal degenerative hypertrophy in second and third DIP, mild tenderness over the second and third PIP, tenderness in the trapezia, nuchal area, lateral epicondyle and normal wrists, elbows and knees. He  stopped the Plaquenil, began a trial of Predisone and Methotrexate and continued the Lortab;

27.  A May 15, 2003, psychological evaluation from Cardinal Psychological Services requested by Montie VanNostrand, attorney for Kandel, indicating

> . . . Results of the WAIS-III indicated Mary
> is functioning in the Average range with a
> full scale IQ of 93, a percentile rank of 32,
> and a 95% confidence interval of 89-97.
> Results of the WAIS are likely valid. Results
> of the MMSE indicate that the client exhibits
> normal cognitive functioning. Results of the
> WRAT-3 yielded scores of grade Post HS in
> Reading, HS in spelling, and HS in Arithmetic.
> All scores are commensurate with education and
> intellectual functioning as measured by the
> WAIS-III. Results of the BVNGT indicate
> adequate perceptual motor functioning. Results
> of the BDI-II indicate severe depression.
> Results of the BAI indicate severe anxiety.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Based on the results of this psychological evaluation, the following recommendations are made:

1. It is recommended that Mary continue medical treatment from the appropriate professional to include an evaluation of her medication and to help her weigh the costs and benefits of this medical treatment.

2. It is recommended that Mary continue psychiatric/psychological treatment from the appropriate professional to include an evaluation of her medication and psychotherapy to address issues surrounding her depressive disorder. The client should be monitored for exacerbation of symptoms. The client should receive assistance/training in order to enhance her adaptive behavior skills;

28. A June 11, 2003 Psychiatric Review Technique from Christy D. Gallaher, MA, Supervised Psychologist, and L. Andrew Steward, Ph.D, licensed Psychologist, indicating a diagnosis of depression with a moderate limitation in restriction of daily activities, a marked limitation in social functioning, a moderate limitation in maintaining concentration, persistence and pace and one or two episodes of decompensation;

29. A June 11, 2003 Mental Residual Functional Capacity Assessment of work-Related Abilities from Christy D. Gallaher, MA, and L. Andrew Steward, indicating a slight limitation in ability to understand, remember and carry out short, simple instructions, a

moderate limitation in the ability to understand, remember and carry out detailed instructions and a marked limitation in the ability to exercise judgment or make simple work-related decisions. The report further indicated that the impairments identified have probably existed at their current level since June 30, 2001;

30. A July 3, 2003 Fibromyalgia Residual functional Questionnaire from Dr. Saikali, indicating a diagnosis of chronic pain syndrome, osteoarthritis in hips, and inflammatory arthritis. It further indicated that Kandel could lift ten or twenty pounds frequently, could frequently bend and twist at the waist, needed periods of walking during an eight hour day, needed to be able to shift positions from sitting, standing or walking, did not need to lie down at unpredictable intervals, did not need to elevate her legs during periods of prolonged sitting, did not need a cane or assistive device, and probably would be absent from work more than three times a month.

31. A further opinion of Dr. Saikali indicating that Kandel has multiple joint complaints and muscle pain that are severe in nature, does not have severe arthritis in one particular joint, has a major dysfunction but does not meet or equal Listing 1.02A.

Significantly, Dr. Saikali noted that the "x-rays do not correlate with the symptoms all the time;"

32. A November 4, 2003 x-ray report from WCMH, indicating degenerative changes of the lumbar spine with intervertebral disk space narrowing at L5-S1 and L2-3 and joint space narrowing of the left hip with osteophyte formation and no radiographic evidence of fracture, bone lesions, or loss of vertebral body height;

33. A November 4, 2003 left knee x-ray from WCMH, indicating no evidence of fracture and tricompartmental joint space narrowing especially involving the medial compartment;

34. A May 14, 2004 bilateral hip x-ray from WCMH, indicating no joint space narrowing and axial migration of the femoral heads, which raises the possibility of rheumatoid arthritis;

35. A May 21, 2004 evaluation from Mona D. Justo, M.D., a pain specialist, regarding complaints of low back pain and groin pain that noted:

> Mary Kandel is a 46-year old patient of Dr. Osbourne who I was asked to see for complaints of lower back and left leg pain.
>
> This has apparently been ongoing for approximately three years. Prior to that she reports doing quite well only experiencing intermittent low back pain. She does give a

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

history of having suffered a compression
fracture of the lumbar spine at the age of 17.

The pain is mostly localized along the lower
lumbar region and into her anterior groin and
over the anterior thigh to the left knee.
Occasionally she does experience some foot
pain. She describes the pain as a constant
ache, sharp shooting and sometimes burning in
nature associated with numbness and pins and
needle-like sensation in her legs. The pain
is aggravated with sitting, standing, walking
coughing, Valsalva maneuvers, bending,
extension and rotation of the lumbar spine.
She has noted some improvement in pain with
the use of heat.

Treatment thus far has been limited to the use
of physical therapy, pain medications, non-
steroid anti-inflammatory medications and
Neurontin. She has seen a rheumatoid
specialist and was apparently diagnosed with
fibromyalgia.

Current medications include tizanidine,
neurontin and hydrocodone.

The patient admits to generalized weakness.
The patient denies any recent change in
bladder or bowel function. The patient denies
any fever or chills.

. . .

Physical Examination revealed a mildly overweight, white female,

tenderness along the temporalis muscle, tenderness on palpation

along the sternocleidomastoid muscles and the posterior cervical

spine, anicteric sclera, tenderness on palpation along spinous

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

---

processes and paravertebral muscles of the thoracic and lumbosacral

region, positive PSIS tenderness, positive gluteal muscle

tenderness, mild ischial bursa tenderness, tenderness over the

greater trochanter bilaterally, tenderness along the tensor fascia

latae and ilial tibial band bilaterally, extremities reveal no

clubbing, cyanosis or edema, and positive Tinel's bilaterally over

both hands and elbows.

Dr. Justo's notes further indicated:

> Examination of the lower extremities reveals
> subjective, patchy, paresthesia over both
> lower extremities. No clubbing, cyanosis or
> edema. Negative Homan's. Babinski down going.
> Straight leg raise increases low back pain,
> leg and hip pain, as well as shoulder and neck
> pain. Patrick's increases pain in the leg and
> groin, as well as the low back. During the
> entire interview and examination, the patient
> had a tendency to hyperventilate. After the
> physical examination and during distraction
> the patient no longer hyperventilated. Gait
> was quite slow and guarded with a fair amount
> of pain behavior. Even light pressure on the
> skin produces an exaggerated amount of pain.
> Positive Waddell' sign. Axillary compression
> increases low back pain and lower
> extremity/radicular-type pain. Axil rotation
> also increased low back and lower extremity
> pain. Patellar reflex +2 bilaterally. Ankle
> reflex +2 bilaterally. Motor is grossly intact
> about 5/5. Some give away weakness is noted.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Dr. Justo's impression indicating diffuse myofascial pain, low back and left lower extremity pain, degenerative disc disease, lumbar spine, trochanteric bursitis, sacroiliitis, DJD, depression and pain magnification. She recommended an EMG of the lower extremities, sedimentation rate, an RA and ANA, water therapy, increase in Zanaflex, continue Vioxx, trial of Trileptal, consideration of trigger point and joint injections, and a follow-up appointment in eight weeks;

36. A May 25, 2004 electromyography report from United Hospital Center ("UHC") reviewed by Dr. Shiv Navada, indicating a normal study, not supportive of polyneuropathy or L3-S1 radiculopathy on either side;

37. A September 7, 2004, drug screen report from WCMH, indicating a positive reading for THC (marijuana);

38. A May 31, 2005, West Virginia Disability Determination Service mental status evaluation from Larry Legg, M.A., a licensed psychologist, indicating normal thought process, mildly deficient immediate, recent and remote memory, moderately deficient concentration, normal persistence and pace, and normal social functioning during the evaluation. Legg noted that Kandel walked with a limp and used a cane. His diagnosis was Axis I, adjustment

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

disorder with depressed mood, chronic, no Axis II diagnosis, and

Axis III of asthma, arthritis, fibromyalgia, bursitis, carpal

tunnel syndrome and osteoarthritis. He further noted:

> The diagnosis of adjustment disorder with
> depressed mood is being made today based
> solely on Ms. Kandel's subjective report that
> she has developed both emotional and
> behavioral symptoms in response to her current
> medical condition. She claims these symptoms
> and behaviors are significant as they cause
> marked distress and impairment in her social
> and occupational functioning.

His prognosis was fair;

 39. A June 9, 2005, West Virginia Disability Determination

Service report from Dr. Sabio, indicating complaints of shortness

of breath, low back pain, and pain in all joints.  Dr. Sabio

reported:

> This 46-year old female complains of shortness
> of breath. She was diagnosed with bronchial
> asthma for many years, and she has a chronic
> bronchitis. She smokes one and half packs
> every week. She takes medications, but she is
> so short of breath that she can only walk one
> block on level ground and then she has to
> stop. On examination, the patient's breathing
> is effortless. She did not have any accessory
> muscle recruitment. She did not have
> wheezing, rales or rhonchi. There was no
> intercostal muscle retractions. She was not in
> respiratory failure. The patient complains of
> low back pain. She relates that she broke her
> back at 17 years of age and the back pains

worsened five years ago, at which time she was diagnosed with fibromyalgia. On this examination, the patient complained of pain from the head to the toes, and even light touch on her back caused her to howl and yell with severe pain. I could not touch any part of her back without her complaining of pain. That includes the superior trapezius muscles, the scapular areas and the entire spine from the base of the neck to the tailbone and even her lumbar and hip areas. She continually complained of pain, even with very light touch. She did not have kyphosis or scoliosis. There was restriction of extension and flexion of the cervical spine due to pain. There was restriction of abduction in the shoulders because of pain in the shoulders and there was restriction of straight leg raising to 80 degrees because of pain in the lumbar spine. Lumbar flexion was only 30 degrees, and she howls with pain; however, she sits without any discomfort with her back perpendicular and her hips bent at 90 degrees, even with her feet extended out, and she did not complain of any pain. The patient had full hip flexion, knee flexion, and the ankles were normal. The patient had a normal gait. She did not require ambulatory aids. Neurological examination was normal. There was no muscle atrophy or weakness;

40. A June 21, 2005 psychiatric review technique from Joseph Kuzniar, Ed.D, indicating a diagnosis of adjustment disorder with depressed mood, a mild degree of limitation in restriction of activities of daily living, a mild degree of limitation in difficulties in maintaining social functioning, a moderate degree

of limitation in difficulties in maintaining concentration, persistence or pace and no episodes of decompensation;

41. A June 21, 2005 mental residual functional capacity assessment from Dr. Kuzniar, indicating an RFC rating that showed Kandel had the capacity to understand, remember and carry out at least one to three step instructions within a low to moderate level of social interaction. Kuzniar rated her capacity for adaptation in Section I-D and indicated no significant limitation in the ability to respond appropriately to changes in the work setting, no evidence of limitation in ability to be aware of normal hazards and take appropriate precautions, ability to travel in unfamiliar places or use public transportation, and ability to set realistic goals or make plans independently of others;

42. A June 29, 2005 physical RFC from Porfirio R. Pascasio, indicating the ability to occasionally lift 50 pounds, frequently lift 20 pounds, stand or walk about six hours of an eight hour workday, sit about six hours of an eight hour workday, unlimited ability to push or pull, occasionally (less than one-third of the time) climb ramp, stairs, ladder or rope scaffolds, frequently (less than two-thirds of the time) balance, stoop, kneel, crouch or crawl, no manipulative, visual, or communicative limitations, and

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

must avoid exposure to extreme cold or heat, humidity and fumes, odors, dust, gases and hazards. Examination revealed no rales, rhonchi or wheezes, breathing was effortless, some decrease in motion and 5/5 muscle strength throughout. Pascasio noted that "[s]he could hardly be palpated on her spine because she howled in pain at the very slightest touch" and believed this demonstrated an over reaction that undermined her credibility;

43. An October 19, 2005, psychiatric evaluation from Lois A. Urick, M.D., of Seneca Health Services, indicating reports of two "mental breakdowns," one "after I found out I was raped as a child for four years" and a second in February 2004 "after my ex-boyfriend almost raped my daughter," no substance abuse other than the use of alcohol, and a history of binge eating on average once a month. Dr. Urick diagnosed Axis I major depressive disorder, recurrent, moderate, Axis II no diagnosis, Axis III diagnosis deferred - patient reports history of fibromyalgia, asthma, COPD, arthritis, Axis IV problems with social environment and Axis V 50. Prognosis is fair and recommended individual therapy to address emotional issues, medication adjustment to better address symptoms of depression, and crisis intervention as appropriate;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

44. A December 7, 2005 clinic record from WCMH, indicating continuing back pain and fibromyalgia, occasional use of marijuana and refill of prescription for hydrocodone which Kandel reported "helped a lot";

45. A February 15, 2006 psychiatric evaluation update from Dr. Urick, indicating a report of doing better since her Remeron was increased, feeling less depressed, not doing as well physically due to increase in pain, and looking for new physician. Dr. Urick recommended increasing the Remeron, continuing Seroquel, Vistaril and individual therapy, crisis intervention as appropriate and follow-up in two months;

46. A July 10, 2006 report from Dr. Urick, indicating an assessment of major depressive disorder with mild to moderate symptoms and continuation of Remeron, Seroquel and Vistaril, a trial of Diazepam with instructions to use either Diazepam or Vistaril for nerves through the day and a follow-up appointment in two months;

47. A July 19, 2006, West Virginia Department of Health and Human Resources Mental Disability Incapacity Evaluation, indicating that Kandel met or equaled the listing for mental impairment and from that same date, a West Virginia Department of Health and Human

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Resources Disability Incapacity Evaluation, that indicated she did not have physical disabilities that met or equaled a listing and therefore was not disabled. The evaluator recommended a re-evaluation on August 7, 2006;

48.   A July 28, 2006, psychiatrist's summary for West Virginia Department of Health and Human Resources welfare medical eligibility indicating a diagnosis of "major depressive disorder" and finding that her "ability to maintain employment is affected by mental illness;"

49.   An August 16, 2006 clinic record from WCMH, reported an increase in pain due to not receiving trigger point injections and diagnosing fibromyalgia and chronic pain syndrome and treatment with Toradol and Lortab;

50.   A September 18, 2006 emergency clinic report from WCMH, indicating injuries to left elbow, left ankle and right arm from a fall down five concrete steps and complaint of continuing low back pain. X-rays revealed a degenerative change in lumbosacral junction and the hips bilaterally, with no definite acute bone or joint abnormality, minimal dextroscoliosis with degenerative change throughout the mid and lower lumbosacral spine, well-preserved intervertebral disc spaces, and no acute bone or joint abnormality.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

She was given demerol, phenergan and toradol and discharged in stable condition;

51. An October 4, 2006 medical progress report from Seneca Health Services, Inc., indicating difficulty falling and staying asleep, poor appetite and energy level, and worsening depression, anxiety and panic attacks. Treatment included decrease in Remeron, addition of Effexor, Valium on an as needed basis, continuation of Seroquel, Vistaril and Diazepam;

52. An October 12, 2006 clinic record from WCMH, indicating complaints of continuing to fall and increased back pain and a diagnosis of musculoskeletal back pain, fibromyalgia, bronchitis and sinusitis;

53. An October 23, 2006 clinic record from WCMH, indicating Kandel reported falling due to her legs giving out and a diagnosis of musculoskeletal back pain, fibromyalgia, bronchitis and sinusitis;

54. A November 8, 2006 emergency clinic report from WCMH, reporting a fall, requesting a pain shot for low back and hip pain, and released in stable condition;

55. A November 15, 2006 clinic record from WCMH, indicating a diagnosis of fibromyalgia and requesting a prescription for

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
---

hydrocodone.  The doctor refused to prescribe any more narcotics,
but told her she could find another physician;

56.  A December 4, 2006 report from Seneca Health Services,
indicating depression was "in remission with current medications;"

57.  A January 16, 2007 psychological evaluation from Cynthia
I. Hagan, MS, supervised psychologist, and Michael D. Morrello, MS,
licensed psychologist, of Chameleon Health Care indicating an
invalid MMPI-2 personality inventory test due to an unusually
elevated "F" score, a verbal IQ of 72, a performance IQ of 73, and
full scale IQ of 70. A diagnosis of Axis I major depressive
disorder, recurrent and severe, anxiety disorder, Axis II deferred,
Axis III headaches, blurred vision, lower back pain, fibromyalgia,
knee pain, bilateral hip pain, bursitis in both arms, carpal tunnel
syndrome in both arms, and numbness in the upper and lower
extremities, Axis IV economic problems, low income, and vocational
problems, unemployed. The report noted:

> . . . Assessments indicate that she is experiencing
> an Above average amount of depression and anxiety.
> Symptoms are consistent with persons who experience
> chronic pain. Her cognitive ability was measured in
> the borderline range. Differences in cognitive
> functioning as measured in the past may be due to a
> variety of factors to include: motivation, pain
> levels or lighting. Based on her interview and

performance on other tasks, I believe her cognitive
ability to be closer to the Low average range.

Report recommended referral to a psychiatrist to assess need for
medication, counseling to address her depression and anxiety,
possible referral to pain clinic, stress management skills, and
monitoring for increased suicidal ideation;

58, A January 16, 2007 mental residual functional capacity
assessment from Cynthia I. Hagan, MS, and Michael D. Morrello, MS,
indicating no limitation in understanding and remembering short,
simple instructions, mild limitation in carrying out short, simple
instructions, moderate limitation in understanding and carrying out
detailed instructions, moderate limitation in exercising judgment
or making simple work-related decisions, marked limitation in
sustaining attention and concentration for extended period, marked
limitation in maintaining regular attendance and punctuality,
marked limitation in completing a normal workday and workweek
without interruption from psychological symptoms, and performing at
a consistent pace without an unreasonable number and length of work
breaks, marked limitation in ability to interact appropriately with
the public, marked limitation in responding appropriately to
direction and criticism from supervisors, moderate limitation in

31

working in co-ordination with others without being unduly distracted by them and without unduly distracting them, marked limitation in ability to relate predictably in social situations in the workplace without exhibiting behavioral extremes, marked limitation in demonstrating reliability, mild limitation in maintaining acceptable hygiene and courteous behavior, mild limitation in ability to ask simple questions or request assistance from co-workers or supervisors, marked limitation in ability to respond to changes in work setting or processes, marked limitation in ability to be aware of normal hazards and take appropriate precautions, marked limitation in ability to carry out ordinary work routine without special supervision, marked limitation in ability to travel independently in unfamiliar places, moderate limitation in ability to set realistic goals and make plans independently of others, and marked limitation in ability to tolerate ordinary work stress;

59. A January 16, 2007 psychiatric review technique from Hagan and Morrello indicating a moderate limitation in restriction of activities of daily living, moderate limitation in difficulty in maintaining social functioning, marked limitation in difficulty in

maintaining concentration, persistence and pace and one or two episodes of decompensation of extended duration; and

60. A January 24, 2007 note from WCMH, indicating back and leg pain "doing much better since starting on Lodine" and reporting that "overall [she] feels pretty good but still has chronic pain issues," a diagnosis of osteoarthritis, fibromyalgia, COPD and hypersolesterolemia and recommending some type of cholesterol medicine together with diet and exercise, and referral to pain clinic.

## VI. DISCUSSION

### A. Remand

Kandel argues that the March 22, 2006 remand order essentially affirmed the ALJ's decision, except for the "listing" impairment finding at Step Three. Therefore, for the period prior to the first ALJ decision, she argues that the only issue for decision is whether or not she met or equaled a listed impairment. According to Kandel, the "whole decisional process was flawed" because the ALJ failed to address the remanded Step Three issue for the period prior to the first ALJ decision, and further failed to perform the required comparison analysis necessary to justify a departure from

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

the prior Step 1-5 findings on the basis of new evidence, passage of time, or some other factor.

The Commissioner, however, contends that, pursuant to Albright, 174 F.3d at 474-75, the second ALJ was entitled to make a new finding because Kandel's 2005 application alleged new impairments, a new date on which she became disabled, April 13, 2005, and included new evidence.

In Albright, the Fourth Circuit held that:

> The SSA treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability. At each decision making level, the agency recognizes the traditional rule that, absent an identity of claims, principles of claim preclusion (historically referred to as res judicata) do not apply... Cf. Rucker v. Chater, 92 F.3d 492, 495 (7th Cir. 1996) (in light of a four-year interval between applications, differing conclusions concerning the claimant's residual functional capacity were 'entirely plausible').

Id. at 476.

20 C.F.R, § 415.1483 provides:

> When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> with instructions to take action and issue a
> decision or return the case to the Appeals
> Council with a recommended decision. If the
> case is remanded by the Appeals Council, the
> procedures explained in § 416.1477 will be
> followed. Any issues relating to your claim
> may be considered by the administrative law
> judge whether or not they were raised in the
> administrative proceedings leading to the
> final decision in your case.

20 C.F.R. § 416.1477, Case remanded by Appeals Council,

provides:

> (b) Action by administrative law judge on
> remand. The administrative law judge shall
> take any action that is ordered by the Appeals
> Council and may take any additional action
> that is not inconsistent with the Appeals
> Council's remand order.

In 2003, the ALJ's severe impairment finding was:

> The claimant has fibromyalgia, osteoarthritis
> of the hips, bronchial asthma, chronic
> obstructive pulmonary disease, adjustment
> disorder with depressed mood, and chronic pain
> syndrome with both physical and psychological
> componenets [sic], impairments considered
> 'severe' based on the requirements in the
> Regulations 20 CFR § 416,920(b).

In 2008, the severe impairment finding included:

> During the period at issue, the claimant has
> had the following medically determinable
> impairments that, either individually or in
> combination, are 'severe' and have
> significantly limited her ability to perform
> basic work activities for a period of at least

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

>        12 consecutive months: 'mild' degenerative
> arthritis/disc disease of the lumbar spine;
> degenerative          arthritis/joint          disease,
> bilateral hips; equivocal 'mild' inflammatory
> arthritis/ 'fibromyalgia,' by report; history
> of asthma/bronchitis; adjustment disorder with
> depressed mood; and history of polysubstance
> (including   alcohol,   crack   cocaine,   and
> marijuana) abuse (20 CRF § 416.920(c)).

Here, the Appeals Council not only remanded this case for further proceedings consistent with the order from the district court, but also directed the ALJ to associate the 2003 and the 2005 claim files <u>and</u> to "issue a new decision on the associated claims." The magistrate judge, therefore, correctly concluded that, pursuant to the directions of the Appeals Council and the standards in <u>Albright</u>, the ALJ did not err when, after reviewing the alleged new impairments, the new date of disability and the newly presented evidence, he ultimately rendered a determination that differed from the prior decision.

**B.    Listings 1.02, 1.04, 3.00, 11.00 and 14.09, and in particular,
       <u>14.09D Inflammatory Arthritis, as it relates to Fibromyalgia</u>**

Kandel next contends that the magistrate judge erred when he concluded that substantial evidence supported the ALJ's finding that her impairments failed to satisfy the criteria of a listed

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

impairment, including 1.00, 1.02, 1.04, 3.00, 11.00 and 14.09, and, in particular, 14.09D Inflammatory Arthritis, as it relates to fibromyalgia.

1.    Listings 1.00, 1.02, 1.04, 3.00 and 11.00

To justify a diagnosis of a musculoskeletal impairment pursuant to Listing 1.00, the record should contain detailed descriptions of the joints, ranges of motion, condition of the musculature (e.g., weakness, atrophy), sensory or reflex changes, circulatory deficits, and laboratory findings, including findings on x-ray or other appropriate medically acceptable imaging (computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans). Listing 1.02 requires objective medical evidence of a major dysfunction of a joint or joints characterized by gross anatomical deformity, chronic joint pain, stiffness with signs of limitation of motion or other abnormal motion of the affected joints, and acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). That evidence should include:

> A. Involvement of one major peripheral weight-
> bearing joint (i.e., hip, knee, or ankle),

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

        resulting in inability to ambulate
        effectively, as defined in 1.00B2b;

Listing 1.04 requires objective medical evidence detailing the rheumatological, orthopedic, neurological, and other findings appropriate to the specific impairment being evaluated, based on findings and observation from the examination and not simply a report of the individual's allegation. The record also should contain evidence of alternative testing methods, as well as a record of ongoing management and evaluation to verify the presence of the abnormal finding for a period of time. Further, the examination findings should be consistent with the individual's daily activities.

Listing 1.04E provides that reports of examination of the spine should include a detailed description of gait, range of motion of the spine in degrees from the vertical position or, for straight-leg raising from the sitting and supine position, any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. The examiner should also include his observations of the individual during the examination, e.g., how he or she gets on and off the examination

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

table, ability to walk on the heels or toes, to squat, or to arise
from a squatting position.

Listing 3.00 states that chronic disorders of the respiratory
system generally produce irreversible loss of pulmonary function
due to ventilatory impairments, gas exchange abnormalities, or a
combination of both. The most common symptoms attributable to these
disorders are dyspnea on exertion, cough, wheezing, sputum
production, hemoptysis, and chest pain. To establish a listing 3.00
impairment, the record must contain reports from physical
examinations, chest x-rays or other appropriate imaging techniques.

Regarding Kandel's physical status, the ALJ specifically noted
evidence of the following:

1.  An April 2002 report indicating a normal gait, no
    ambulatory aids, no muscle atrophy or weakness, no report
    of back injury, diminished breath sounds and expiratory
    wheezing in the lower lung fields, no evidence of labored
    breathing, no cyanosis, no accessory muscle recruitment
    and no evidence of respiratory failure

2.  A July 2003 fibromyalgia residual functional
    questionnaire from Dr. Saikali noting the "x-rays do not
    correlate with the symptoms all the time" and opining
    that Kandel did not meet the criteria for Listing 1.02A.
    Significantly, Dr. Saikali, the treating rheumatologist,
    also opined that Kandel "has a major dysfunction but does
    not meet or equal Listing 1.02A."

3.  A November 2003 x-ray report from WCMH revealing
    degenerative changes of the lumbar spine with

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

intervertebral disk space narrowing at L5-S1 and L2-3 and joint space narrowing of the left hip with osteophyte formation but no evidence of fracture, bone lesions, or loss of vertebral body height;

4.    A May 2004 report from Dr. Justo, a pain specialist, diagnosing pain magnification;

5.    A September 2006 x-ray report from WCMH that noted a degenerative change in lumbosacral junction and the hips bilaterally, with no definite acute bone or joint abnormality; an x-ray of the lumbar spine that showed minimal dextroscoliosis with degenerative change throughout the mid and lower lumbosacral spine, well preserved intervertebral disc spaces with no acute bone or joint abnormality; and

6.    A July 2003 fibromyalgia residual functional questionnaire from Dr. Saikali, noting the "x-rays do not correlate with the symptoms all the time" and opining that Kandel did not meet the criteria for Listing 1.02A.

Based on its _de_ _novo_ review, the Court agrees with the magistrate judge's conclusion that the record contains substantial evidence to support the ALJ's finding that Kandel's impairments fail to satisfy the criteria of a listed impairment, including 1.00, 1.02, 1.04, 3.00, and 11.00.

2. Listings 12.00, 12.04 and 12.09

In considering Listing Impairments 12.00, 12.04, and 12.09, the ALJ determined that Kandel had failed to satisfy the criteria for a listed mental impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (Mental Disorders) provides:

40

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months . . . medical source evidence should reflect the medical source's considerations of information from you and other concerned persons who are aware of your activities of daily living; social functioning; concentration, persistence, or pace; or episodes of decompensation.

To establish an impairment pursuant to 20 C.F.R. Pt. 404, Subpt P, App1, 12.04, Affective Disorders, a claimant must provide evidence that is:

[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

a.   Anhedonia or pervasive loss of interest in almost all activities; or

b.   Appetite disturbance with change in weight; or

c.   Sleep disturbance; or

d.   Psychomotor agitation or retardation; or

e.   Decreased energy; or

f.   Feelings of guilt or worthlessness; or

g.   Difficulty concentrating or thinking; or

h.   Thoughts of suicide; or

I.   Hallucinations, delusions or paranoid thinking; or

2.   Manic syndrome characterized by at least three of the following:

a.   Hyperactivity; or

b.   Pressure of speech; or

c.   Flight of ideas; or

d.   Inflated self esteem; or

e.   Decreased need for sleep; or

f.   Easy distractability; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulty in maintaining concentration, persistence or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

2. A residual disease process that
has resulted in such marginal
adjustment that even a minimal
increase in mental demands or change
in the environment would be
predicted to cause the individual to
decompensate; or

3. Current history of 1 or more
years' inability to function outside
a highly supportive living
arrangement, with an indication of
continued need for such an
arrangement.

Here, the evidence considered by the ALJ included:

1) A report from a mental status exam with Dr. Joseph
indicating normal socialization and only "moderately" impaired
concentration;

2) A May 2003 report from Cardinal Psychological Services
for a psychological evaluation requested by Kandel's attorney,
indicating good concentration, no hospitalization for emotional
problems, a full scale IQ of 93, and normal cognitive functioning;

3) A June 2003 Mental Residual Functional Capacity
Assessment of work-related abilities from Gallaher and Steward,
indicating a slight limitation in ability to understand, remember
and carry out short, simple instructions, a moderate limitation in
the ability to understand, remember and carry out detailed
instructions, and a marked limitation in the ability to exercise
judgment or make simple work-related decisions. This report further
indicated that the identified impairments have probably existed at
their current level since June 30, 2001;

4) A May 31, 2005, West Virginia Disability Determination
Service mental status evaluation, indicating normal thought
process, mildly deficient immediate, recent and remote memory,
moderately deficient concentration, normal persistence and pace,

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

normal social functioning during the evaluation, and noting that Kandel walked with a limp and used a cane, and that the diagnosis had been made based solely on Kandel's subjective report;

5) A June 21, 2005 mental residual functional capacity assessment, indicating an RFC rating showing the capacity to understand, remember and carry out at least one to three step instructions, a low to moderate level of social interaction, no significant limitation in the ability to respond appropriately to changes in the work setting, no evidence of limitation in ability to be aware of normal hazards and take appropriate precautions, ability to travel in unfamiliar places or use public transportation, and ability to set realistic goals or make plans independently of others;

6) An October 2005 evaluation from Seneca Health Services indicating Kandel reported having had two "mental breakdowns", and having been "on a drunken binge for months" after learning of the first "breakdown;

7) A December 2006 report from a follow-up appointment with Seneca Health Services, indicating her depression was "in remission;"

8) A January 2007 psychological evaluation from Chameleon Health Care, indicating that the results of a MMPI-2 personality inventory test were invalid due to an unusually elevated "F" score, a verbal IQ of 72, a performance IQ of 73, and a full scale IQ of 70m all of which were markedly different from the 2003 results (verbal 90; performance 98; and full scale 93); and

9) A January 2007 psychiatric review technique from Chameleon Health Care indicating a moderate limitation in restriction of activities of daily living, moderate limitation in difficulty maintaining social functioning, marked limitation in difficulty maintaining concentration, persistence and pace, and one or two episodes of decompensation of extended duration.

According to Magistrate Judge Joel, this evidence

substantially supported the ALJ's determination that Kandel had not

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

met the required "marked" deficiencies or episodes of decompensation or twelve consecutive months of a mental impairment. He also concluded that the ALJ had correctly determined that Kandel's self-reports were unreliable. He based this on a myriad of inconsistences contained in the medical reports and evaluations, her history of substance abuse, her progressively escalating allegations of disability, and, as well , the inexplicable 20 point drop in her IQ scores. Because the psychologists based their opinions, at least in part, on her subjective complaints, Magistrate Judge Joel concluded that the ALJ had a reasonable basis to reject their opinion that Kandel had a listed mental impairment. The Court agrees.

3.  <u>Listing 14.09D</u>

To establish an impairment pursuant to listing 14.09D, a claimant must provide objective evidence of:

> D. Repeated manifestations of inflammatory arthritis with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1.    Limitation of activities of daily living;
>
> 2.    Limitation in maintaining social functioning.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

3. Limitation in completing tasks in a
timely manner due to deficiencies in
concentration, persistence, or pace.

Listing 14.00 D6, inflammatory arthritis, provides:

a. General. The spectrum of inflammatory
arthritis includes a vast array of disorders
that differ in cause, course, and outcome.
Clinically, inflammation of major peripheral
joints may be the dominant manifestation
causing difficulties with ambulation or fine
and gross movements; there may be joint pain,
swelling and tenderness. The arthritis may
affect other joints, or cause less limitation
in ambulation or the performance of fine and
gross movements. However, in combination with
extra-articular features, including
constitutional symptoms or signs (sever
fatigue, fever, malaise, involuntary weight
loss), inflammatory arthritis may result in an
extreme limitation.

Listing 14.00D6e(ii) "How we evaluate inflammatory arthritis"

provides:

(ii) Listing-level severity is shown in
14.09B, 14.09C2 and 14.09D by inflammatory
arthritis that involves various combinations
of complications of one or more major
peripheral joints or other joints, such as
inflammation or deformity, extra-articular
features, repeated manifestations, and
constitutional symptoms or signs. Extra-
articular impairments may also meet listing in
other body systems.

According to Magistrate Judge Joel, even though the ALJ did

not specifically list this impairment by number in his R&R, he did

actually evaluate the criteria for inflammatory arthritis, and at

Step Three of the sequential evaluation, determined:

> 3. During the period at issue, the claimant
> has had no medically determinable impairments,
> whether considered individually or in
> combination, that have presented symptoms
> sufficient to meet or medically equal the
> severity criteria for any impairment listed in
> Appendix 1, Subpart P, Regulation No. 4. (20
> CFR §§ 416.920(d), 416, 925 and 416.926).
>
> In so concluding, the undersigned has
> appropriately evaluated medical and other
> evidence pertaining to the claimant's
> medically determinable impairments in
> conjunction with all relevant severity
> criteria contained within the 1.00
> Musculoskeletal System (including listings
> 1.00 Major dysfunction of a joint(s) and 1.04
> Disorders of the spine), 3.00 Respiratory
> System, 11:00 Neurological, 12.00 Mental
> Disorders (including listing 12.04 Affective
> Disorders and 12.09 Substance Addition
> Disorders, section B) series of listed
> impairments.

The ALJ's extensive review of the evidence of record

specifically noted the following:

1)    negative results for blood tests for rheumatoid factor
      and ANA;

2)    a report from Dr. Saikali noting multiple joint
      complaints and muscle pain that were severe in nature but
      that failed to demonstrate severe arthritis in one
      particular joint;

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

3)   a 2005 report indicating an ability to walk with normal
     gait, to squat fully, and to walk on heels, toes and
     heel-to-toe in tandem, despite arriving at the
     appointment using a cane;

4)   repeated reports indicating that Kandel exaggerated her
     pain, including "howling in pain at the slightest touch;"

5)   vertebrogenic x-ray reports that failed to substantiate
     any abnormal findings at L3-4 or any old fracture of the
     back; and

6)   mental status reports that failed to substantiate any
     combination of psychological impairments resulting in
     more than mild limitation on activities of daily living
     and social functioning, moderate limitation in
     concentration, persistence and pace or resulting in
     episodes of decompensation.

Based on its <u>de novo</u> review, the Court concludes that the
record contains substantial evidence to support the ALJ's
determination that Kandel's impairments fail to satisfy the
criteria of Listing 14.09D.

Regarding Kandel's reported diagnosis of fibromyalgia, the ALJ
determined that, because a diagnosis of fibromyalgia is based on
subjective complaints, a determination of a claimant's credibility
is critical to the analysis. After noting a multitude of
inconsistencies in Kandel's statements to medical practioners, and
her testimony at the hearing, the ALJ concluded that

        the claimant has had medically determinable
        impairments during the period at issue that

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

could reasonably be expected to produce some
of the symptoms that she has alleged. However,
the claimant's February 2007 hearing testimony
and other attributed statements of record
concerning the intensity, persistence and
limiting effects of her impairment-related
symptoms throughout such period are not
entirely credible.

In that regard, the Administrative Law Judge
does not find the claimant to be particularly
credible or reliable informant, and notes that
her longstanding contentions of 'total
disability' are predicated largely upon the
veracity of her subject complaints, more so
than any clearly convincing, supportive
objective medical findings. The claimant has a
poor work record. The claimant has
demonstrated essentially no historical
inclination, motivation or need to seek and
sustain employment activity in any 'official'
capacity, even prior to the onset of any of
her allegedly disabling symptoms. . . .

The ALJ's credibility determination thoroughly documented Kandel's

inconsistent statements throughout the pendency of her case, and

specifically noted the escalation of Kandel's subjective complaints

of reported pain on her three SSI filings, the numerous

inconsistencies regarding her back injury in reports to various

medical practioners, her history of alcohol and substance abuse,

her arrest record, her 2005 report of two mental breakdowns, and

her propensity to withhold information or to be vague in order to

present herself in the light most favorable to obtaining benefits.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

In <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986), the Fourth Circuit held that mere diagnosis of a condition is not enough to prove disability; there must be a showing of related functional loss. In <u>Sarchet v. Chater</u>, 78 F.3d 305, 306-07 (7th Cir. 1996), a case that involved a claim of disability based on fibromyaligia, the Seventh Circuit found that the plaintiff in that case had

> claim[ed] that in 1990 she became totally disabled as a consequence of fibromyaligia also known as fibrositis - a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyaligia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and - <u>the only symptom that discriminates between it and other diseases of a rheumatic character - multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyaligia)</u> that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch . . . .

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> The record before the administrative law
> judge consisted of Sarchet's testimony plus
> the reports of several doctors who had
> examined her. . . . But they disagreed about
> the extent to which her ability to move around
> is limited by the effect of movement on her
> 'pain all over' or by muscular weakness
> resulting from tenderness, fatigue, and
> limited mobility. Sarchet testified that her
> pain has virtually immobilized her but of
> course the administrative law judge did not
> have to believe her. If the administrative
> law judge believed the medical reports that
> found that Sarchet has enough strength to work
> and disbelieved Sarchet's own testimony, this
> would compel the denial of the application for
> benefits. We cannot say that this combination
> of belief and disbelief would be unreasonable
> but we cannot uphold a decision by an
> administrative agency, any more than we can
> uphold a decision by a district court, if,
> while there is enough evidence in the record
> to support the decision, the reasons given by
> the trier of fact do not build an accurate and
> logical bridge between the evidence and the
> result. (Citations omitted).

(Emphasis added.)

Here, based on the ALJ's determination that Kandel was not
totally credible, and the lack of objective medical evidence
confirming the presence of eleven of the eighteen trigger points
that Sarchet found are the "rule of thumb" for a diagnosis of
fibromyaligia, the magistrate judge concluded that substantial
evidence supported the ALJ's determination that Kandel did not

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

satisfy the criteria in Listing 14.09D regarding a diagnosis of fibromyalgia.

After de novo review, the Court agrees with Magistrate Judge Joel's recommendation that the record in this case contained substantial evidence to support the ALJ's decision that Kandel's impairments, whether alone or in combination, did not meet or equal the criteria for any listed impairment.

**C.   Residual Functional Capacity Finding**

Pursuant to 20 C.F.R. §§ 404.1520 and 404.545(a), having determined that Kandel did not meet or equal a listing, the ALJ was required to review all of the evidence of record, including the medical evidence regarding physical and mental limitations, pain symptoms, daily activities and credibility, prior to rendering his RFC finding. Here, the ALJ first determined that Kandel had an underlying physical or mental condition that could be expected to produce the alleged pain or other debilitating symptoms. He then evaluated Kandel's allegations of pain and other symptoms, her activities of daily living, the objective medical evidence not based on her subjective statements, the location, duration, frequency, and intensity of the alleged pain or other symptoms, factors that precipitate and aggravate the symptoms, the type,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

dosage, effectiveness and side effects of any medication that claimant takes or has taken to alleviate the pain or other symptoms, treatment other than medication to relieve the pain or other symptoms, any measures other than treatment used to relieve pain or other symptoms, and any factors concerning functional limitations and restrictions due to pain or other symptoms. After doing so, he determined that Kandel retained the residual functional capacity ("RFC") to perform, within a clean air environment, a range of work activity that

> requires no more than a "light" level of physical exertion; affords opportunity for brief, one to two minute changes of position at least every half-hour; requires no climbing of ladders, ramps, ropes, scaffolds or stairs; requires no overhead lifting or reaching; requires no crawling or kneeling, or more than occasional balancing, crouching or stooping; entails no concentrated exposure to temperature extremes, excessive humidity / wetness or respiratory irritants (e.g. dust, fumes, gases, noxious odors, smoke); entails no exposure to hazards (e.g., dangerous moving machinery, unprotected heights); requires no close concentration or attention to detail for extended periods; involves no fast-paced or assembly line type of duties; entails no interaction with the general public; presents no more than occasional changes in the work setting; requires no travel as part of the job; and accommodates up to one unscheduled workday absence per month.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Administrative Record at 580.

According to 20 C.F.R. § 404.1567,

> *Light work* involves lifting no more than 20
> pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very
> little, a job is in this category when it
> requires a good deal of walking or standing,
> or when it involves sitting most of the time
> with some pushing and pulling of arm or leg
> controls.   To be considered capable of
> performing a full or wide range of light work,
> you must have the ability to do substantially
> all of these activities.  If someone can do
> light work, we determine that he or she can
> also do sedentary work...
>
> *Sedentary work* involves lifting no more than
> 10 pounds at a time and occasionally lifting
> or carrying articles like docket files,
> ledgers, and small tools.   Although a
> sedentary job is defined as one which involves
> sitting, a certain amount of walking and
> standing is often necessary in carrying out
> job duties.  Jobs are sedentary if walking and
> standing are required occasionally and other
> sedentary criteria are met...If someone can do
> light work, we determine that he or she can
> also do sedentary work.

Based on his review of the evidence of record, the ALJ
concluded that all of the RFC evaluations established that Kandel
retained the capacity to perform light or sedentary work. Moreover,
by the finding that she could perform light work involving simple
routine activities, Kandel's psychological symptoms, joint space

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
────────────────────────────────────────────────────

narrowing, and other equivocal findings had been fully
accommodated.

After de novo review, the Court agrees with the conclusion in
the R&R of the magistrate judge that the record contains
substantial evidence to support the ALJ's RFC finding.

**D.  Ability to perform other work in the national economy.**

In Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990), the Fourth
Circuit held that substantial evidence must support an ALJ's
conclusion that a claimant can perform other work.

> Substantial evidence...consists of more than a
> mere scintilla of evidence but may be somewhat
> less than a preponderance...Thus, it is not
> within the province of a reviewing court to
> determine the weight of the evidence, nor is
> it the court's function to substitute its
> judgment...if the decision is supported by
> substantial evidence. *See Laws*, 368 F.2d at
> 642; *Snyder*, 307 F.2d at 529. **Ultimately, it
> is the duty of the administrative law judge
> reviewing a case, and *not* the responsibility
> of the courts, to make findings of fact and to
> resolve conflicts in the evidence.** *King*, 599
> F.2d at 599. "This Court does not find facts
> or try the case *de novo* when reviewing
> disability determinations." *Seacrist*, 538
> F.2d at 1056-57; "We note that it is the
> responsibility of the [Commissioner] and not
> the courts to reconcile inconsistencies in the
> medical evidence, and that it is the claimant
> who bears the risk of non-persuasion."
> *Blalock*, 483 F.2d at 775. **"The language of
> the Social Security Act precludes a *de novo***

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> **judicial proceeding and requires that the
> court uphold the decision even should the
> court disagree with such decision as long as
> it is supported by 'substantial evidence.'"**

907 F.2d at 1456 (emphasis added). Here, the magistrate judge
concluded that the ALJ's finding that Kandel could perform other
work is supported by substantial evidence. After <u>de</u> <u>novo</u> review,
this Court adopts the magistrate judge's finding in this regard.

Having determined that Kandel retained the capacity to perform
light or sedentary work, the ALJ was required at the final step of
the disability analysis to consider Kandel's age, education, work
experience, residual functional capacity assessment, and vocational
expert testimony to determine whether there is work in significant
numbers in the national economy that she could perform. The ALJ's
analysis noted that, pursuant to 20 C.F.R. § 404.1563, during the
period at issue, Kandel was a younger individual, age 43 to 49
years, with a "GED" degree, and non-transferable job skills.

At the hearing, a vocational expert ("VE") testified that
someone with Kandel's residual functional capacity would be able to
perform "light exertional" jobs, such as an office assistant and
laundry folder, and that there were at least 2,425 of these types
of jobs available regionally in West Virginia, Eastern Ohio,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Western Maryland, and Western Pennsylvania, and 200,000 jobs nationwide. The VE further testified that Kandel also could perform "sedentary" jobs, such as a machine tender or general sorter, and that there were at least 650 of these kinds of jobs available regionally in West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania and 50,000 jobs nationwide. After considering Kandel's age, education, work experience, residual functional capacity assessment, and vocational expert testimony, the ALJ concluded that jobs exist in the national economy that she could perform. Based on the record, Magistrate Judge Joel found there was substantial evidence for this conclusion. The Court agrees.

## VII. <u>CONCLUSION</u>

Following <u>de novo</u> review of Kandel's objections, the Court concludes that she has not raised any issues that were not thoroughly considered by Magistrate Judge Joel in his R&R. Moreover, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before the Court in this action. Therefore, it accepts Magistrate Judge Joel's R&R in whole and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the magistrate judge. Accordingly, the Court

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

1.   **GRANTS** the defendant's motion for Summary Judgment (Docket No. 15);

2.   **DENIES** the plaintiff's motion for Summary Judgment (Docket No. 12); and

3.   **DISMISSES WITH PREJUDICE** and **RETIRES** this civil action from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

If a petition for fees pursuant to the Equal Access to Justice Act (EAJA) is contemplated, the plaintiff is warned that, as announced in Shalala v. Schaefer, 113 S.Ct. 2625 (1993), the time for such a petition expires in ninety days.

DATED: March 31, 2010.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE